Kenneth Lee **SADLER** and Violet Sadler, Plaintiffs Below, Appellants,

v.

**NEW CASTLE COUNTY,** James D. **McCarnan,** Harry **Connor,** Eric **Cannon,** Richard **Hegelund, Professional Ambulance Service, Inc.,** a Delaware corporation, **Talleyville Fire Company,** a Delaware corporation, the **Mayor and Council of Wilmington,** Carmen **Maiorano,** Edward **Hojnicki** and Ronald **Anderson, Defendants Below, Appellees.**

Supreme Court of Delaware.

Submitted: May 9, 1989.
Decided: Oct. 26, 1989.

Morton Richard Kimmel (argued), Edward B. Carter, Jr. and William R. Peltz, of Kimmel, Weiss & Carter, P.A., Wilmington, for appellants.

John G. Mulford (argued) and David S. Lank, of Theisen, Lank, Mulford & Goldberg, P.A., Wilmington, for appellees, New Castle County, James D. McCarnan and Eric Cannon.

F. Alton Tybout, of Tybout, Redfearn & Pell, Wilmington, for appellee, Richard Hegelund.

Paul M. Lukoff (argued) of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellee, Talleyville Fire Company.

Jeffrey S. Goddess (argued) of Saul, Ewing, Remick & Saul, Wilmington, for appellees City of Wilmington, Carmen Maiorano, Edward Hojnicki and Ronald Anderson.

Before HORSEY, MOORE and WALSH, JJ.

WALSH, Justice:

This is an appeal from the grant of summary judgment by the Superior Court in favor of certain governmental entities and their employees who participated in the rescue of the plaintiff, Kenneth Lee Sadler,[1] after he was injured in a fall in the Brandywine River. In his Superior Court action, Sadler contended that the individuals who participated in the rescue and the governmental entities who employed or controlled them, New Castle County (the "County"), Talleyville Fire Company ("Talleyville"), and the City of Wilmington (the "City"), were negligent in selecting an unduly hazardous means to remove him from the bank of the river, thereby seriously aggravating his injuries.

In granting summary judgment to the governmental entities and their employees, the Superior Court ruled that the immunity conferred under the Municipal Torts Claims Act, 10 *Del.C.* §§ 4001–4013 (the "Act") precluded Sadler's claims based on simple negligence. Additionally, the Superior Court ruled that Sadler's claim against the City was barred by the one-year notice of claim requirement and that Talleyville did not waive its statutory immunity through the purchase of public disability insurance. *Sadler v. New Castle County*, Del.Super., 524 A.2d 18 (1987).

Although we differ with the rationale of the Superior Court decision, we affirm the application of the Municipal Torts Claim Act as a bar to recovery against all governmental entities and their agents or employees. Accordingly, we affirm.

### I

The unfortunate events which led to this litigation are largely undisputed. On July 31, 1983, Sadler, who was then 20 years of age, together with three companions, was floating down the Brandywine River on logs. As the group approached a turbulent and rocky section of the river known as "Brandywine Falls", Sadler and his friends left the logs and proceeded to walk along the top of a waterfall to reach the side of the river. Sadler lost his footing and fell approximately six feet over the falls to the water below, apparently striking his head. His companions managed to pull Sadler, who had lost consciousness, from the water and onto the rocky north shore of the river. While one of his companions administered CPR until Sadler began breathing on his own, another friend swam to the south side of the river to summon help.

Two New Castle County paramedics, James D. McCarnan and Eric Cannon, were dispatched to the scene and proceeded to the north side of the river, parking on a high bluff overlooking the bank where Sadler lay. At about the same time an ambulance from the Talleyville Fire Company arrived with at least two attendants. In order to get from the area where the emergency vehicles were parked to Sadler's location on the river bank, it was necessary to traverse a rocky path approximately one-quarter mile down the embankment. McCarnan and Cannon, together with the Talleyville personnel, proceeded down the path. They carried assorted emergency equipment, including a cardiac box, a long backboard, a cervical collar, a trauma box, an oxygen tank and radio equipment. The path was crossed with fallen trees and the rescue personnel were occasionally required to jump from boulder to boulder.

When the emergency personnel reached Sadler, they found him lying on his left side, breathing on his own but evidencing mild seizure activity. He was placed in a cervical collar, given an I.V. injection of dextrose and administered oxygen. Sadler was next placed on a scoop-type orthopedic stretcher with his head taped to the stretcher to keep it immobilized. The stretcher was placed in a Stokes carrying basket and secured to the basket with straps. By radio, McCarnan then contacted Dr. Jay Feldstein, an emergency physician on duty at the Wilmington Medical Center. McCarnan relayed Sadler's condition and the first-aid measures already tak-

---

1. Although the plaintiffs in the Superior Court and the appellants in this Court are Kenneth Lee Sadler and his wife, Violet Sadler, only the injuries sustained by Mr. Sadler are at issue in this appeal. Accordingly, the plaintiffs-appellants will be referred to as "Sadler."

en. Dr. Feldstein agreed with the steps taken to stabilize Sadler's condition and also later acquiesced in the paramedics' decision to transport Sadler across the river.

The decision to transport Sadler across the river was made by McCarnan, rescue personnel from Talleyville, and City of Wilmington firemen who had by then arrived on the south side of the river and managed to cross the river with a large rope. Several alternatives were first considered: use of a helicopter, a boat, carrying Sadler up the bank to the Alapocos side or carrying him across the river to the south side using a rope sling. A helicopter evacuation was deemed not practical because of overhanging trees and the lack of a side door on the helicopter. This meant that the Stokes basket would have to swing beneath the helicopter. A boat was requested but the rescuers were advised that none was available. Thus, the only two feasible alternatives were transport up the cliff or across the river. Since the rescue personnel had just traversed the path to the Alapocos woods, they were aware of the difficulties posed by that route. McCarnan believed that any attempt to carry Sadler up the hill posed danger to both Sadler and rescue personnel. It was then agreed that the safest option lay in transporting Sadler across the river.

The river transport was accomplished by attaching the Stokes basket to a rope stretched across the river and secured on both sides. The top of the falls was considered too slippery for passage, so the rescuers decided to wade across and attach the rope at a new location on the south shore. The basket was attached to the rope with clips to permit it to slide and another rope was attached to the front of the basket and pulled from the south side of the river. Because of the length of the ropes, there was some sagging, with the result that the Stokes basket could not be kept completely out of the water despite the efforts of the rescuers who guided the basket. There is some dispute concerning the extent to which the basket sagged into the water. Sadler contends that his head was submerged several times during the rescue but McCarnan claims that while members of the rescue team occasionally lost their footing, Sadler's head never went under the water.

After Sadler's transport across the river, he was placed in an ambulance and transported to the hospital, where he was diagnosed as having suffered quadriplegia. In support of their motion for summary judgment, the defendants submitted the affidavit of a neurosurgeon, Dr. William Kraut, who opined that rescue personnel exercised the appropriate standard of care in treating and transporting Sadler and that, in any event, Sadler's quadriplegia resulted from the fall over the falls and not from any subsequent contact with the water while crossing the river. In opposition, Sadler offered an affidavit from Dr. John Hocutt, a family physician, who claimed that in view of the knowledge of rescue personnel that Sadler had sustained a possible spinal cord injury and required head and neck stability, it was an act of recklessness to attempt to transport him across the river rather than up the bank.

Based on the conflict in medical opinion, the Superior Court denied summary judgment as to the individual County paramedics, ruling that a material issue of fact was presented on the issue of wanton misconduct. Summary judgment was granted as to the County and Talleyville, however, based on the immunity conferred by the Municipal Torts Claim Act. Additionally, summary judgment was granted in favor of the City of Wilmington because of Sadler's conceded failure to give written notice to the City as required by 10 *Del.C.* § 8124.[2] Therefore the parties consented

**2.** Section 8124 provides:

No action, suit or proceeding shall be brought or maintained against the Mayor and Council of Wilmington for damages on account of physical injuries, death or injury to property by reason of the negligence of the Mayor and Council of Wilmington or any of its departments, officers, agents or employees thereof, unless the person by or on behalf of whom such claim or demand is asserted shall, *within one year from the happening of such injury,* notify the Mayor in writing of the

to the entry of final judgment in favor of all defendants, governmental and individual. In this appeal, Sadler has tacitly abandoned his claim of wanton misconduct against the individual defendants but seeks reversal of the Superior Court's application of the Municipal Tort Claims Act.

## II

■ The Superior Court determined that Sadler's claim against the municipal entities was barred because the various devices used by the rescue personnel to transport Sadler did not fall within the definition of "equipment" as that term is used in the exception to immunity provision of the Act.[3] While we reach the same result, our analysis of Sadler's claim proceeds upon a different rationale. In our view, Sadler's claim fails because it is directed against a decision that enjoys immunity under the substantive provision of section 4011, not because the devices used to implement that decision do not fall within the statutory exception.

Our analysis of the scope of immunity conferred by the Act is dictated, in large part, by this Court's decision in *Fiat Motors of North America, Inc. v. Mayor and Council of Wilmington,* Del.Supr., 498 A.2d 1062 (1985), which explored both the legislative history of the Act itself and its effect on prior Delaware decisional law in the area of governmental immunity. As *Fiat* makes clear, in enacting this law the General Assembly intended not only to provide a broad statutory premise for the invocation of immunity but also to eliminate the uncertain distinction between the governmental and proprietary activities of municipal entities. This uncertainty had been engendered, in part, by prior Delaware deci-

sions that had grappled with this distinction. *Id.* at 1065–66. When faced with the question of whether a particular activity is protected from suit, the initial recourse is to the broad language of section 4011(a) of the Act, which affords governmental entities immunity "from suit on any and all tort claims seeking recovery of damages." In section 4011(b), this immunity is further categorized by a statement of types of governmental undertakings to which immunity applies. The expansiveness of the concept of immunity is emphasized by the notation that section 4012 (the exception provision) is "notwithstanding"; thus, the listing of examples of immunity is not intended to be exclusive of other immunity applications. It may further be inferred from the statutory format and language that while the grant of immunity is broadly cast and open-ended, the excepted activities are narrow and restrictive. *Fiat Motors,* 498 A.2d at 1066.

Among the listed immune undertakings in section 4011(b) are those arising from discretionary functions:

(3) The performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion be abused and whether or not the statute, charter, ordinance, order, resolution, regulation or resolve under which the discretionary function or duty is performed is valid or invalid.

While it would appear that the most common application of immunity to discretionary governmental functions involves policy decisions under the police power, errors committed in the exercise or enforcement of activities undertaken under the police power also enjoy protection. *See* McQuil-

time, place, cause and character of the injuries sustained.
**3. § 4012. Exceptions to immunity.**
A governmental entity shall be exposed to liability for its negligent acts or omissions causing property damage, bodily injury or death in the following instances:
(1) In its ownership, maintenance or use of any motor vehicle, special mobile equipment, trailer, aircraft or other machinery or equipment, whether mobile or stationary.
(2) In the construction, operation or maintenance of any public building or the appurte-

nances thereto, except as to historic sites or buildings, structures, facilities or equipment designed for use primarily by the public in connection with public outdoor recreation.
(3) In the sudden and accidental discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalines and toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.

lan, *The Law of Municipal Corporations,* § 53.22a (3d ed. 1984). The use of the term "performance" in section 4011(b)(3) is a clear indication that the legislature intended to include within the scope of the Act's immunity not only the policy decision to undertake a function but also the manner in which that undertaking is discharged. Moreover, when section 4011(b)(3) is read in full sectional context with the addition of the introductory language of section 4011(b) that denies the imposition of liability "for any claim which results from", it is apparent that the Act's immunity, *prima facie,* extends to the manner or method selected by governmental employees to discharge the police power.

■ In its ruling granting immunity to the governmental defendants, the Superior Court focused on the equipment exception in section 4012, rather than on the basic grant of immunity conferred in section 4011. While such an approach might be warranted where the equipment allegedly produces or was the instrument of the harm and the plaintiff's claim is based on an alleged defect or improper maintenance, this is not such a case. There is no claim here that Sadler was injured because any of the assorted items of rescue equipment were defective when used in his rescue. Indeed these same items, including the Stokes basket and the stretcher, would have been used in whatever course was followed to remove him from the site of his injury. Essentially, Sadler's claim of injury is based on the judgment made by rescue personnel to transport him across the river, rather than to negotiate the climb to the top of the cliff. The equipment to be used in either course, or any other reasonably available, was incidental to the underlying judgment. Moreover, given the nature of Sadler's injuries and the need for quick evacuation, the rescuers on the scene were required to employ the equipment that was on hand and available. There is no claim that other more suitable equipment could have been used.

In our view, Sadler's claim of negligent rescue implicates only the performance of a discretionary governmental function protected by section 4011(b)(3), a type of activity historically considered immune under the common law. *Fiat Motors of N. Am., Inc. v. Mayor and Council of Wilmington,* 498 A.2d at 1066. We find no basis for application of the equipment exception because of the lack of any causative relationship between the rescue equipment used in this case and the injuries claimed by Sadler. Accordingly, we affirm the grant of summary judgment as to all governmental entities but on the ground that the equipment exception under section 4012 does not provide Sadler a basis for avoiding the broad grant of immunity conferred by section 4011 of the Act.

### III

■ Our holding that the equipment exception has no arguable application to the disposition of the defendants' governmental immunity claim renders it unnecessary to review the Superior Court's construction of that term. We note, however, a number of trial court decisions, including this case, in which judges have wrestled with the problem of what constitutes "equipment" within the meaning of section 4012(1).[4] We deem it appropriate therefore to offer some guidance in the future application of the statutory term.

The application of section 4012(1) has proved troublesome because of the general language—"or other machinery or equipment"—that appears in the statute following a list of designated items of municipal property that includes "any motor vehicle, special mobile equipment, trailer, aircraft." Because the term "equipment," in its broadest sense, may embrace an endless

---

4. *Porter v. Delmarva Power & Light Co.,* Del.Super., 488 A.2d 899 (1984), *rev'd on other grounds,* Del.Supr., 547 A.2d 124 (1988) (electric transmission line owned by municipality); *Ritgert v. City of Rehoboth Beach,* D.Del., 655 F.Supp. 1101 (1987) (bench on boardwalk); *White v. Crowley,* Del.Super., C.A. No. 84C–AP– 87, 1986 WL 5850, Balick, J. (May 8, 1986) (handcuffs); *Home Ins. Cos. v. Mayor and Council of Wilmington,* Del.Super., C.A. No. 83C–JL– 74, Martin, J. (July 10, 1984) (manhole cover); *Hedrick v. Blake,* D.Del., 531 F.Supp. 156 (1982) (policeman's night stick).

variety of material items within the possession, ownership, or control of a governmental entity, a literal application of the term may seriously erode the Act's general grant of immunity and result in the exception swallowing the rule. For this reason, a "formalistic etymological approach" to the equipment exception has been criticized. *See Ritgert v. City of Rehoboth Beach,* D.Del., 655 F.Supp. 1101, 1103 (1987). Similarly, in this case, the Superior Court rejected Sadler's contention that various items used by his rescuers, including the stretcher, Stokes basket and lifeline were "special mobile equipment" because they were used to transport Sadler across the river. The Court ruled that the term "special mobile equipment" refers to "instruments which are commonly at the center of tort suits and which, by virtue of their potential to inflict damage and injury when negligently maintained or used, are subject to regulation under our laws." 524 A.2d at 24. The court also appeared to favor an *ejusdem generis* approach in applying the "other equipment" language of section 4012(1). We agree with this construction of the statute.

As noted earlier, this Court emphasized in *Fiat Motors,* that "[t]he Act was not a mere alteration of the doctrine of municipal immunity" but an extension of the doctrine "to areas where it did not formerly apply" and as to which prior decisional law had cast doubt. 498 A.2d at 1064. Moreover, the section 4012 exceptions are subject to strict construction as derogative of this broad grant of immunity. *Id.* at 1066. In our view, the equipment exception is thus limited to those items of unusual design or size, such as motor vehicles, aircraft or electric transmission lines, which in their normal use or application pose a particular hazard to members of the public. We do not believe that the General Assembly intended to extend to the term "equipment" or "special mobile equipment" so broad a definition as to include items of incidental use which, in themselves, present no such

risk. Certainly, in this case we cannot accord to items designed to implement life saving measures for the benefit of the public a risk potential that outweighs the underlying statutory purpose of furthering municipal immunity.

In *Fiat Motors* this Court, in its analysis of the history and format of the Act, noted that Delaware's act was closely modeled after Maine's Municipal Tort Claims Act, Me.Rev.Stat.Ann. tit. 14, §§ 8101 *et seq. Fiat Motors,* 498 A.2d at 1067 n. 8. The Maine Supreme Court in *McNally v. Town of Freeport,* Me.Supr., 414 A.2d 904 (1980), in rejecting the contention that a hypodermic syringe fell within the equipment exception of the Maine statute, commented:

> All definitions are perilous. Particularly since the legislative history of this statute is far from clear, we hesitate to announce an all-inclusive construction of one of its major provisions. It is sufficient to note that for a device to come within the meaning of § 8104(1)(G) it must, as a result of its negligent ownership, maintenance or use, create a risk of injury to person or property comparable to the risk created by the negligent ownership, maintenance or use of the specifically enumerated items of machinery and equipment.

414 A.2d at 906.

We too hesitate to impose a precise standard for application of the equipment exception since the statute itself is broadly cast. But a *ejusdem generis* approach is an appropriate standard for discerning legislative intent and we endorse its application in future cases that arise under the Act.

## IV

■ Sadler argues that if the Municipal Torts Claims Act is applied to bar his claim of negligence the result is an arbitrary classification of tortfeasors, violative of Article I, § 9 of the Delaware Constitution [5]

5. Article I, § 9 provides:
All courts shall be open; and every man for an injury done him in his reputation, person, movable or immovable possessions, shall

have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial or unreasonable delay or

and the equal protection clause of the United States Constitution. We agree with the Superior Court that the Act does not run afoul of the Delaware Constitution since the last sentence of Article I, § 9 clearly contemplates the authority of the General Assembly to limit the extent to which the State, either directly or through its political subdivisions, will be subject to suit.

■ With respect to Sadler's attack on the Act on equal protection grounds, this Court rejected a similar contention in *Doe v. Cates*, Del.Supr., 499 A.2d 1175 (1985). There the equal protection argument was directed against the doctrine of state sovereign immunity, a concept which, under Delaware law, is of broader sweep and admits of fewer exceptions than the Municipal Tort Claims Act. In *Doe*, this Court ruled that since plaintiffs having the same type of claims are not subject to disparate treatment in the face of the defense of sovereign immunity, a claim of lack of equal protection is not sustainable. *A fortiori,* an equal protection claim directed against the Act must also fail.

### V

■ The Superior Court also rejected Sadler's claim that Talleyville was not entitled to invoke the protection of the Act because its purchase of public liability insurance amounted to a waiver of the Act's immunity. Since Talleyville is concededly a governmental entity within the meaning of the Act, the waiver question is fully controlled by this Court's ruling in *Fiat Motors* to the effect that the Act's immunity cannot be waived through the purchase of insurance but only through express statutory authority. *Fiat Motors of N. Am., Inc. v. Mayor and Council of Wilmington*, 498 A.2d at 1068. There is no suggestion in this record that such a statutory waiver exists. Accordingly, the mere purchase of insurance will not operate as a waiver.

Sadler's final assertion of error involves the Superior Court's grant of summary

expense. Suits may be brought against the State, according to such regulations as shall

judgment to the City of Wilmington based on Sadler's admitted non-compliance with the one-year notice period that governs claims against the City. In view of our holding that the City of Wilmington, along with the other governmental entities, is entitled to the grant of summary judgment under the immunity imparted by the Municipal Torts Claim Act, we do not find it necessary to decide the notice issue.

The decision of the Superior Court granting summary judgment to all governmental entities is clearly correct as a matter of law and is, accordingly, AFFIRMED.