**TRIPLE C RAILCAR SERVICE, INC.,**
Plaintiff Below, Appellant,

v.

**The CITY OF WILMINGTON, a munici-
pal corporation of the State of Dela-
ware, Defendant Below, Appellee.**

Supreme Court of Delaware.

Submitted: June 1, 1993.
Decided: Aug. 25, 1993.

C. Scott Reese (argued), Cooch and Taylor, Wilmington, for plaintiff appellant.

Jeffrey S. Goddess (argued), Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, for defendant appellee.

Before VEASEY, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court en banc.

WALSH, Justice:

In this appeal from the Superior Court, we examine the question of governmental immunity under the County and Municipal Torts Claim Act, 10 *Del.C.* § 4010 *et seq.* The appellant, Triple C Railcar Service, Inc. ("Triple C"), contends that the Superior Court erred in granting summary judgment in favor of the City of Wilmington ("City") in an action for damages for the City's alleged negligence in the maintenance of a tidegate which resulted in the flooding of Triple C's property. Triple C also assigns as error the Superior Court's rejection of its claim that Triple C is an intended third-party beneficiary of a contract between the City and the federal government which requires proper maintenance of the tidegate. We conclude that the City enjoys immunity from claims arising out of the negligent operation of the tidegate and that Triple C is not entitled to third-party beneficiary status. Accordingly, we affirm.

## I

In reviewing the grant of summary judgment, we view the facts, as did the Superior Court, from the plaintiff's perspective, according Triple C the benefit of all factual inferences. Triple C operates a railcar maintenance facility in a low lying area of New Castle County known as the Shellpot Basin. The area in question is adjacent to Shellpot Creek, a tributary flowing into the Delaware River. For many years, a tidegate had existed across Shellpot Creek to regulate the tide flow from the Delaware River which, if left unchecked at times of heavy tides, creates the risk of flooding in the Shellpot Basin.

In 1976, the City applied for a federal grant to reconstruct the tidegate to control better the flow of water from the Delaware River. Under a grant from the United States Department of Commerce, the City constructed a large dam-like structure composed of eight 84″ steel flapgates. The flapgates were enclosed in a concrete structure with a walkway and parkway grates on top. Trash racks, to catch debris, were constructed on both sides of the structure along its entire length. As designed and constructed, the tidegate structure extended 120 feet across Shellpot Creek with the gates opening to permit upstream water to flow through to the Delaware River and closing to prevent high tides from the river flooding areas along the Shellpot Basin. Essential to the operation of the tidegates was the removal of debris from the trash racks because the debris might otherwise prevent the gate flaps from operating. Indeed, a condition of the federal grant for construction of the tidegates required the City to "operate and maintain the facility."

In 1986, Triple C entered into an agreement with Conrail for lease of a site, consisting of land, buildings and trackage, for operation of a railroad car repair facility. On two occasions in the summer of 1989, the site was subject to extensive flooding after heavy rainstorms, resulting in damage to buildings and equipment. It was later determined that the flooding was attributable, in part, to the failure of the Shellpot Creek flood gates to permit flow from Shellpot Creek into the Delaware River. In an action filed in Superior Court, Triple C alleged that the flood gates failed to operate because of the accumulation of debris around and in the trash racks. The City has admitted that it had performed no debris removal at the tidegate structure between the 1977 reconstruction until the 1989 flooding. Thus, for the purpose of summary judgment disposition, negligence on the part of the City was conceded.

In moving for summary judgment in the Superior Court, the City argued that its assumed negligence could not be a basis for recovery under the County and Munici-

pal Torts Claim Act ("Act"), 10 *Del.C.* § 4012 *et seq.*, and that Triple C could not recover as an intended third-party beneficiary under the City's agreement with the federal government to maintain the tidegates. In granting summary judgment, the Superior Court rejected Triple C's contention that the City's immunity from suit did not extend to negligence claims arising out of the "ownership, maintenance or use of ... equipment" under 10 *Del.C.* § 4012(1). The court further ruled that Triple C, as a member of the public, was entitled to third-party beneficiary status only if such an intent was expressly manifested in the agreement between the City and the federal government. Since the Court was unable to find any such provision, it concluded that Triple C cannot be deemed a third-party beneficiary with standing to assert a contractual claim.

## II

■ The Superior Court's rulings represent application of statutory or legal precepts to undisputed facts. Our review of such decisions is *de novo. Levinson v. First Delaware Insurance Co.*, Del.Supr., 549 A.2d 296, 298 (1988). *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1141 (1990).

■ The City's claim of immunity for claims arising from its failure to maintain the tide gates is based on the Act's broad language and the narrow construction afforded any exceptions thereto. *Fiat Motors of North America, Inc. v. Mayor and Council of the City of Wilmington*, Del. Supr., 498 A.2d 1062, 1066 (1985). This Court has recognized the legislative intention in this area as "not only to provide a broad statutory premise for the invocation of immunity but also to eliminate the uncertain distinction between governmental and proprietary activities of municipal entities." *Sadler v. New Castle County*, Del. Supr., 565 A.2d 917, 921 (1989). Although the question of whether the Act extends immunity for municipal torts implicating discretionary conduct continues to be the subject of debate, *Sussex County v. Morris*, Del.Supr., 610 A.2d 1354 (1992), we are not here concerned with the discretionary/ministerial distinction. Triple C relies solely upon the so-called equipment exception under § 4012(1). Indeed, it would appear that the requirement that the City keep the tidegates free of debris to permit them to serve their intended function is so clearly a routine maintenance obligation that the failure of the City to remove debris, on its face, is an act of ministerial negligence.

In relying upon the equipment exception, Triple C must fashion its claim to fall with the specific language of 10 *Del.C.* § 4012(1), which provides:

"A governmental entity shall be exposed to liability for its negligent acts or omissions causing property damage, bodily injury or death in the following instances:

(1) In its ownership, maintenance or use of any motor vehicle, special mobile equipment, trailer, aircraft or other machinery or equipment, whether mobile or stationary."

In *Sadler*, this Court cautioned that using the term "equipment" to "embrace an endless variety of material items within the possession, ownership, or control of a governmental entity ... may seriously erode the Act's general grant of immunity and result in the exception swallowing the rule." *Sadler*, 565 A.2d at 922–23. To avoid such an approach, we endorsed application of the interpretive principle of *ejusdem generis, i.e.*, "where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." Black's Law Dictionary 464 (5th ed. 1979). In *Sadler*, we further defined the excepted equipment class by use: "the equipment exception is ... limited to those items of unusual design or size, such as motor vehicles, aircraft or electric transmission lines, which in their normal use or application pose a particular hazard to members of the public." *Sadler*, 565 A.2d at 923. The clear infer-

ence in *Sadler* is that governmental immunity should not extend to negligent use and operation of equipment which present risks to the public because of its high mobility or inherent dangerousness.

While it might be argued that the tidegate structure is of "unusual design or size," in its normal use or application it poses no particular hazard. Like most structures affixed to the land serving a passive governmental function such as water control, the tidegate does not carry or generate energy or contain hazardous components. Similar to a dam, it is located in an isolated area, poses little danger to the general public and, as contrasted with motor vehicles or electric transmission lines, mere contact with the structure poses no particular harm.

Triple C seeks to distinguish *Sadler* and other equipment exception cases, *Ritgert v. City of Rehoboth Beach*, D.Del., 655 F.Supp. 1101 (1987) (boardwalk bench) and *White v. City of Wilmington*, Del.Super., C.A. No. 84C–AP–87, 1986 WL 5850, Balick J. (May 8, 1986) (handcuffs), on the ground that in those cases the equipment was merely incidental to the municipality's misconduct. Here, it is argued, the equipment itself was the direct cause of damage as the result of improper maintenance. This distinction is of limited aid in the analysis. The language of § 4012(1) is all encompassing in denying immunity for negligent acts in the "ownership, maintenance or use" of equipment whether the equipment is the direct or incidental cause of the harm. Thus, it matters little whether a municipally owned motor vehicle causes injury because it is carelessly operated or is improperly equipped for its intended purpose. *Cf. Sussex County v. Morris*, 610 A.2d at 1359–1360.

Finally, Triple C seeks to analogize the tidegates to the electric utility pole and transmission lines determined to be within the equipment exception in *Porter v. Delmarva Power & Light Co.*, Del.Super., 488 A.2d 899 (1984), *rev'd on other grounds*, Del.Supr., 547 A.2d 124 (1988). Triple C contends that the Superior Court's holding in *Delmarva* sustained the equipment ex-

ception by viewing electric transmission lines as appurtenances to a utility system. The Superior Court drew a parallel between such appurtenances and the taxation of similar utility components as machinery and equipment. *Delmarva*, 488 A.2d at 906. Thus, it is argued, tidegates, as part of a larger flood control system, should be deemed equipment within the meaning of § 4012(1).

In our view, the taxation analogy is of limited value in attempting to determine legislative intent in the area of governmental immunity. A better rationale, applying *Sadler's ejusdem generis* approach, would place electric transmission lines in the equipment exception because "their normal use or application pose a particular hazard to members of the public." *Sadler*, 565 A.2d at 923. Unlike a dam or tidegate, an electric transmission line presents a constant, ever-present potential for harm simply through contact, even when the equipment is operating as intended. Moreover, such devices, of necessity, are in close proximity to the public to whom they deliver electricity. Tidegates, as this case illustrates, are located in remote, sparsely inhabited areas with little public interaction or exposure. The hazardous nature and operation of electric transmission lines which supports their inclusion in the equipment exception are not common to flood control devices such as tidegates.

We conclude that the equipment exception under 10 *Del.C.* § 4012(1) is inapplicable to the ownership by the City of the tidegate structure at Shellpot Creek. Thus, the assumed negligence of the City in maintaining that structure may not be the basis for a claim of property damage. The Superior Court correctly granted summary judgment in favor of the City in that respect and its ruling must be affirmed.

### III

■ Alternative to its tort-claim which is barred by the City's immunity, Triple C contends that it may proceed to enforce a breach of contract claim as an intended third-party beneficiary. The Superior

Court found this claim to be without legal foundation. We agree.

Triple C argues that, when the City received federal funding for the 1977 reconstruction of the tidegates, the City represented to the funding agency, the United States Department of Commerce, that the purpose of the project was to abate flooding in the Shellpot Basin and render the area more desirable for prospective industry. The terms of the federal grant required the City to continually maintain the tidegates and thus, the arguments runs, any harm resulting from the failure of such maintenance should be actionable on the part of any industrial user.

Triple C concedes that it was not identified in the grant or the documentation which led to funding. Indeed, Triple C did not commence its operations until nine years after the reconstruction of the tidegates. It contends, however, that the Superior Court failed to consider the surrounding circumstances between the City and the United States to determine whether there was an intention to confer third-party beneficiary status on prospective industrial occupiers of the basin area.

■ It is axiomatic that either party to an agreement may enforce its terms for breach thereof. Richard A. Lord, *Williston on Contracts* § 1:1 (4th ed. 1990). Equally settled is the principle that a third person, who is, in effect, a stranger to the contract, may enforce a contractual promise in his own right and name if the contract has been made for his benefit. *Wilmington Housing Authority v. Fidelity & Deposit Co. of Maryland*, Del.Supr., 47 A.2d 524 (1946). Essential to a third party's right of enforceability is the intention of the contracting parties to view that party as either a donee or creditor beneficiary. *Browne v. Robb*, Del.Supr., 583 A.2d 949, 954 (1990). Thus, a private citizen may enforce a claim as a beneficiary against a State government which has, in turn, agreed to perform a duty owed that person by the federal government. *Blair v. Anderson*, Del.Supr., 325 A.2d 94, 96–97 (1974).

■ Where a member of the public asserts third-party beneficiary status to enforce a promise made to the federal government, such status will be recognized only in limited circumstances. *Pajewski v. Perry*, Del.Supr., 363 A.2d 429, 430–432 (1976). In *Pajewski*, this Court adopted the Restatement rule as the standard for determining third-party standing to enforce promises made to the United States. That rule provides in pertinent part:

"A promisor bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless,

(a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences, ...."

*Restatement of the Law: Contracts* § 145.

In applying the Restatement rule, the Court in *Pajewski* found nothing in the contract or in the surrounding circumstances to confer the right to sue the State. *Pajewski*, 363 A.2d at 431. Here, Triple C concedes that the contract does not expressly manifest an intention to confer third-party beneficiary status upon it but faults the Superior Court for not examining "the circumstances surrounding" the formation of the contract to determine if there was an implied promise to compensate members of the public for contractual breach. While it is true that the Superior Court did not engage in a discussion of the "surrounding circumstances," we are not persuaded that the record supports a contrary result.

■ As the language of the Restatement rule makes clear, a promisor to the government assumes "no duty under the contract," enforceable at the behest of a member of the public, unless such "an intention is manifested in the contract." *Restate-

*ment,* § 145. There must be some indication in the contract itself of such an intention before any interpretive search of the surrounding circumstances is undertaken to resolve ambiguity. The documentation which constitutes the "contract" in this case consisted of the application by the City, a form promulgated by the U.S. Department of Commerce with supporting attachments, for five separate drainage reduction projects in or around the City of Wilmington, including the Shellpot Creek tidegate. The application contained a list of "assurances," requiring the applicant to comply with a myriad of federal regulations, one of which, promulgated by the U.S. Corps of Engineers, required that local flood protection structures be kept free of debris. 33 C.F.R. § 208.10(d). Thus, to the extent that the City was required to maintain the tidegates free of debris, that obligation does not appear on the face of the documentation but only through incorporation of pertinent federal regulations.

At the time the City received federal approval of its application, Triple C did not occupy the property affected by the tidegates and, accordingly, was not a third-party beneficiary at the formation of the contract. Thus, the "surrounding circumstances" at the time did not include consideration of Triple C's interests. To the extent Triple C later became a putative third-party beneficiary, it was as part of a "poorly defined" group with complex contractual interests whose members are considered incidental beneficiaries. *Browne v. Robb,* Del.Supr., 583 A.2d 949, 955 (1990). As an incidental beneficiary, Triple C does not enjoy standing to bring suit on the contract. *Id.* at 954 n. 5. The Superior Court correctly determined that Triple C could not proceed contractually and the grant of summary judgment was appropriate.

The judgment of the Superior Court is AFFIRMED.