IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MORGAN McCAFFREY, | § | |
| | § | No. 26, 2015 |
| Plaintiff Below, | § | |
| Appellant, | § | |
| | § | |
| | § | Court Below – Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| CITY OF WILMINGTON, and | § | C.A. No. N12C-01-138 |
| CHIEF MICHAEL J. SZCZERBA, | § | |
| individually and in his capacity as an | § | |
| officer, | § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |

Submitted: December 9, 2015
Decided: February 4, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Bartholomew J. Dalton, Esquire (*argued*), Laura J. Simon, Esquire, Dalton & Associates, P.A., Wilmington, Delaware, for Plaintiff Below, Appellant, Morgan McCaffrey.

Daniel McAllister, Esquire (*argued*), City of Wilmington Law Department, Wilmington, Delaware, for Defendants Below, Appellees, City of Wilmington and Chief Michael Szczerba.

**SEITZ**, Justice, for the Majority:

## I.   INTRODUCTION

While off-duty, out of uniform, driving his own car, and under the influence of alcohol, Wilmington Police Officer Michael Spencer ran a red light and collided with a car driven by Morgan McCaffrey.  After the accident, Officer Spencer asked McCaffrey to handle the matter without police involvement and to move their damaged cars out of the roadway and into parking spaces in front of McCaffrey's nearby apartment.  Officer Spencer and McCaffrey then went into the apartment, where Officer Spencer undressed and made sexual advances toward McCaffrey, which she refused.  McCaffrey called the police after Officer Spencer passed out in her bed.  The responding officers took Officer Spencer to the hospital, and later to the police station, where after a delay of five hours, Officer Spencer supposedly passed field tests for intoxication.  The Wilmington Police Department (the "WPD") disciplined Officer Spencer for his conduct that evening.

McCaffrey filed suit against Officer Spencer, the WPD, and others, including former Chief of Police Michael Szczerba, stemming from the car accident and Officer Spencer's admitted inappropriate conduct with McCaffrey.  In a series of opinions, the Superior Court dismissed all claims against the defendants other than Officer Spencer, and entered a final judgment excluding Officer Spencer.[1]  The claims against Officer Spencer are pending.

---

[1] *McCaffrey v. City of Wilmington*, 2012 WL 1593062 (Del. Super. Apr. 25, 2012) ("*McCaffrey I*"); *McCaffrey v. City of Wilmington*, 2012 WL 3518119 (Del. Super. Aug. 9, 2012) ("*McCaffrey II*"); *McCaffrey v. City of Wilmington*, 2013 WL 4852497 (Del. Super. June 26, 2013) ("*McCaffrey III*"), *judgment vacated in part on reconsideration*, 2014 WL 598030 (Del. Super.

McCaffrey raises two issues on appeal. First, McCaffrey claims that the Superior Court erred by dismissing Count I of her second amended complaint as to the City. McCaffrey argues that she sufficiently alleged that Officer Spencer was acting within the scope of his employment as a Wilmington Police Officer when he ran into McCaffrey's car and made inappropriate sexual advances after the accident. Second, McCaffrey claims that the Superior Court erred in dismissing Count IV of the second amended complaint against Chief Szczerba and the City because the County and Municipal Tort Claims Act (the "Tort Claims Act") did not immunize them from suit for Officer Spencer's actions.

We find no merit to McCaffrey's arguments. First, McCaffrey dropped the claims against the City under Count I of her amended complaint. After the Superior Court dismissed Count I of the original complaint, McCaffrey filed two amended complaints that deleted the City as a defendant in the amended Count I, and deleted her allegations of *respondeat superior* liability. Following amendment, McCaffrey never alleged or argued below that the City could be liable under Count I for any conduct other than the car accident. Therefore, she cannot recover against the City under the amended Count I.

Second, as to Chief Szczerba, we agree with the Superior Court that, even after considering the record in the light most favorable to McCaffrey, Chief Szczerba's actions in hiring, retaining, and supervising Officer Spencer do not fall within the wanton

Jan. 31, 2014); *McCaffrey v. City of Wilmington*, 2014 WL 6679176 (Del. Super. Nov. 3, 2014) ("*McCaffrey IV*").

negligence exception to immunity under the Tort Claims Act. Finally, we agree with the Superior Court that the City is immune from suit under the Tort Claims Act, but for different reasons than those found by the Superior Court. McCaffrey cannot show that the mere fact that Officer Spencer had a weapon and other related items at the time of the accident implicates the equipment exception to the Tort Claims Act. Therefore we affirm the judgment of the Superior Court.

## II. BACKGROUND[2]

On June 4, 2010, Wilmington Police Officer Michael Spencer attended a "Beef and Beer" police academy fundraiser and then drove under the influence of alcohol to a bar in Wilmington. Officer Spencer was off duty, not in uniform, and driving his own car. After leaving the bar, Officer Spencer again drove under the influence, eventually colliding with Morgan McCaffrey's vehicle at Second and Orange Streets in the City of Wilmington. The accident occurred around 2:00 a.m. on June 5, 2010. McCaffrey does not allege that Officer Spencer was on duty, in his police uniform, or driving a police vehicle at the time of the accident.

Immediately following the accident, Officer Spencer contacted WPD dispatch to report the accident using the WPD's administrative line, a number that is not publicly listed. McCaffrey overheard his conversation with the police and believed he was speaking in "cop terms."[3] Officer Spencer then showed McCaffrey his police

---

[2] Unless otherwise noted, the facts are taken from the Superior Court's decision in *McCaffrey IV*, the second amended complaint, and the discovery record.
[3] App. to Opening Br. at 594.

4

identification and asked her if she would be willing to "handle it civilly," to which she agreed "[b]ecause he was a police officer."[4]

Officer Spencer cancelled the call to the police, and then approached McCaffrey, put his hands on her shoulders, and kissed her on the lips. McCaffrey backed away, and Officer Spencer apologized. He then asked McCaffrey where she lived and, after determining that she lived nearby, suggested that they move their vehicles, presumably closer to her apartment. McCaffrey agreed, expecting that once they got their cars out of the road they would be able to exchange insurance information. She "had confidence in him, because he was a police officer, that he was telling [her] the right things to do . . . ."[5]

After they parked near McCaffrey's apartment, Officer Spencer removed his gun, magazine, and badge from the glove compartment of his car and asked McCaffrey to hold them for him. McCaffrey placed the items in her purse, at which time she "just kind of felt like at that point whatever he was asking [she] should probably just kind of go along with."[6]

Meanwhile, Corporal Ralph Schifano arrived at the accident scene and found evidence of a serious accident, but no vehicles or drivers. Corporal Schifano alerted the WPD dispatch supervisor, who began investigating and found that the person who took Officer Spencer's original call into WPD dispatch knew that Officer Spencer was a police officer and "could tell that he might be drunk because [of] the way he was acting on the

---

[4] *Id.* at 596.
[5] *Id.* at 601.
[6] *Id.* at 602.

phone and the way he was talking."[7] The dispatch supervisor did not alert anyone because "he didn't want to get the officer in trouble."[8]

Officer Spencer suggested to McCaffrey that they go to McCaffrey's apartment to discuss the accident. McCaffrey agreed, "solely based on the fact that . . . he was a police officer."[9] Once in the apartment, McCaffrey went to the bathroom and, upon emerging, found that Officer Spencer had removed his pants, but still had on "basketball shorts."[10] He gestured for McCaffrey to sit next to him on her futon, which doubled as her bed and was the only piece of furniture in the one-room apartment. McCaffrey sat on the futon as far away from him as she could, at which point Officer Spencer asked if she wanted to have sex. After McCaffrey said no, Officer Spencer stood in front of her with one leg on each side of her legs, then sat down such that he was straddling her. With his hands on her shoulders, he asked a second time if McCaffrey wanted to have sex. After McCaffrey rejected him a second time, he got up and laid down on the bed, at which point McCaffrey returned to the bathroom "to get away from him."[11] While in the bathroom, she changed into a hoodie and sweatpants. After she returned to the main room of the apartment, she found Officer Spencer asleep. McCaffrey then left the apartment to seek help.

---

[7] *Id.* at 738.
[8] *Id.* at 441-42.
[9] App. to Opening Br. at 605.
[10] *Id.* at 608.
[11] *Id.*

After trying to call several friends, McCaffrey made contact with a neighbor in her building. McCaffrey informed him that she had been in an accident and wanted to come down to his apartment and talk about it. The neighbor agreed. After hearing everything that had happened, the neighbor advised her to call 911. McCaffrey told her neighbor that she was scared to call the police because "it involved an officer." [12] McCaffrey also suggested she was hesitant to call the authorities because, at the time, a bench warrant was outstanding for her arrest for unpaid tickets. McCaffrey ultimately called 911 at 3:52 a.m.

Several police officers arrived at the apartment building. When the officers entered McCaffrey's apartment, they found Officer Spencer "laying [*sic*] naked on the bed covered by a sheet." [13] He appeared drunk, smelled of alcohol, and attempted to dress himself by "putting his legs through the shirt instead of over his head." [14] After being taken to Wilmington Hospital and cleared for injuries, the police took Officer Spencer to the police station.

At the station, when Corporal Schifano informed Officer Spencer that he would need to be chaperoned while going to the bathroom, Officer Spencer "became very upset and agitated" and tried to stop Corporal Schifano from entering the restroom with him. [15] Officer Spencer initially refused sobriety tests, but eventually consented and after a five hour delay supposedly passed eight tests. Officer Spencer later testified that he did not

---

[12] *Id.* at 909.
[13] *Id.* at 287.
[14] *Id.*
[15] App. to Opening Br. at 287.

remember taking any of the sobriety tests. After disciplinary proceedings conducted by the Office of Professional Standards, the disciplinary arm of the WPD, the WPD suspended Officer Spencer for 31 days. Officer Spencer also entered an alcohol rehabilitation program after the incident. The only criminal charge that resulted from Officer Spencer's conduct was a traffic citation for failure to stop at a red light.

## III. PROCEDURAL HISTORY

McCaffrey filed her first complaint on January 19, 2012, alleging negligence, recklessness, and civil rights violations against Officer Spencer, the City of Wilmington, the WPD, and various members of the WPD. She also alleged negligent hiring, retention, and supervision against the WPD and the City, assault and battery against Officer Spencer, and intentional infliction of emotional distress against all police officer defendants.

The City moved to dismiss two counts of the complaint—Count I (negligence and recklessness relating to the auto accident) and Count II (civil rights violations under 42 U.S.C. § 1983). The WPD moved to dismiss the entire complaint. In its first decision dated April 25, 2012,[16] the Superior Court dismissed the WPD from all claims because it is not an independent entity subject to suit, and dismissed the City from Count II because *respondeat superior* liability is not recognized for federal civil rights violations under 42 U.S.C. § 1983. The court also granted the City's motion to dismiss Count I because McCaffrey limited Count I to the traffic accident, and Officer Spencer was not acting

---

[16] *McCaffrey I.*

8

within the scope of his employment when he caused the traffic accident. As the court stated in dismissing Count I, "Notably, Count I only addresses the traffic accident and does not address the alleged unwanted sexual contact between Spencer and McCaffrey."[17]

On May 24, 2012, and then on June 5, 2012, McCaffrey filed her first and then second amended complaints. The amendments removed the WPD as a defendant, added as defendants the additional police officers who had been involved in the incident, and added Chief Szczerba as a defendant. In Count IV of the amended complaints, McCaffrey alleged that Chief Szczerba had been negligent in hiring, training, and supervising Officer Spencer (the "Supervisory Liability" claim).[18] Importantly, McCaffrey deleted the allegations in Count I of the original complaint where she had alleged that Officer Spencer acted within the scope of his employment with the WPD and the City. She also dropped the City as a defendant from Count I. The court eventually disposed of each of the remaining counts by way of a circuitous path against all defendants except Officer Spencer.

First, the City and the officer defendants moved to dismiss the assault and battery and intentional infliction of emotional distress[19] counts of the second amended complaint

---

[17] *Id.* at *2.

[18] McCaffrey alleged "Negligent and Reckless Hiring, Retention and Supervision" in the heading of Count IV of her second amended complaint and alleged "gross negligence and recklessness in hiring, training and supervising" Officer Spencer in the body of Count IV.

[19] The Superior Court referred to negligent infliction of emotional distress in its August 9, 2012 opinion even though McCaffrey alleged intentional infliction of emotional distress in Count VI of her second amended complaint.

9

on the ground that the Tort Claims Act provided immunity from suit for these claims.[20] The Superior Court granted the motion, finding that no exception applied to the Tort Claims Act because McCaffrey failed to plead that she suffered any physical injury, a requirement for an exception to apply.

Next, on June 26, 2013, the Superior Court granted summary judgment to the individual officer defendants for the federal civil rights claims where McCaffrey alleged that the defendants failed to enforce the law against Officer Spencer. The court ruled that the alleged conduct did not rise to the level of a deprivation of McCaffrey's constitutional rights.[21] The court also granted the City summary judgment on the constitutional claims, finding that Spencer's misconduct could not be traced to any policy or custom of the City, and *respondeat superior* did not apply. As to the Supervisory Liability claim against Chief Szczerba, the Superior Court found that there was no evidence to show that Chief Szczerba or the City knew or were deliberately indifferent to Officer Spencer's propensity to drive drunk or to act inappropriately toward women.[22] As the court held, "there [was] no evidence that Chief Szczerba had contemporaneous knowledge of the events of June 5, 201[0] or a pattern of prior similar incidents for [McCaffrey] to establish deliberate indifference [on his part.]"[23] The court therefore granted summary judgment on this claim.

---

[20] 10 *Del. C.* § 4012.
[21] *McCaffrey III*.
[22] *Id.* at *12.
[23] *Id.* at *13.

The Superior Court thereafter partially vacated its June 26, 2013 order dismissing the Supervisory Liability count. In granting summary judgment on Count IV, the court had assumed it was addressing exclusively a federal civil rights claim under 42 U.S.C. § 1983. McCaffrey asserted on reargument, and the court reluctantly agreed, that Count IV also could be read to include a state-law Supervisory Liability claim against Chief Szczerba and the City.[24]

Chief Szczerba and the City then moved for summary judgment on the state-law Supervisory Liability claim, which the court granted on November 3, 2014.[25] The court reasoned that Chief Szczerba and the City were immune from liability under the Tort Claims Act. For Chief Szczerba, the court granted summary judgment because, despite possible indications that Officer Spencer might have problems with alcohol, the WPD had taken steps to discipline him. Moreover, "these step[s] help demonstrate that Chief Szczerba did not evidence conscious indifference evidencing an 'I-don't-care attitude' as to Officer Spencer's behavior."[26] For the City, the court found that the "decisions to hire, retain, and supervise Officer Spencer were discretionary functions," making the City immune.[27] With summary judgment granted in favor of the defendants for the Supervisory Liability claim, the only remaining claims were those against Officer Spencer personally.

---

[24] *McCaffrey*, 2014 WL 598030.
[25] *McCaffrey IV*.
[26] *Id.* at *9.
[27] *Id.* at *7.

11

Although Officer Spencer remains a defendant, McCaffrey requested entry of final judgment as to the City, the Officers, and Chief Szczerba, which the Superior Court entered on January 5, 2015. This appeal followed.

## IV. ANALYSIS

On appeal, McCaffrey makes two main arguments. First, she maintains that the Superior Court erred in determining that Officer Spencer's actions were outside the scope of his employment. Second, she argues that the Superior Court erred in finding Chief Szczerba and the City immune from suit under Count IV of the second amended complaint alleging grossly negligent and reckless hiring, retaining, and supervising Officer Spencer.

### A. The Superior Court's Dismissal Of Count I (Negligence And Recklessness Relating To The Auto Accident)

McCaffrey claims that the Superior Court erred when it dismissed Count I of the second amended complaint against the City because Officer Spencer's actions during and after the June 5, 2010 accident were within the scope of his employment. McCaffrey cites to the Superior Court's decision in *McCaffrey I* and challenges the court's analysis of the scope of employment issue.[28] This Court reviews *de novo* a trial court's decision on a motion to dismiss.[29] Likewise, we review a trial court's determination of questions of law *de novo*.[30]

---

[28] Opening Br. at 14 (citing *McCaffrey I*).
[29] *RBC Capital Mkts., LLC v. Educ. Loan Trust IV*, 87 A.3d 632, 639 (Del. 2014).
[30] *Barley Mill, LLC v. Save Our Cnty., Inc.*, 89 A.3d 51, 60 (Del. 2014).

The problem with McCaffrey's argument is that the Superior Court's decision in *McCaffrey I* addressed Count I of the original complaint. After the court dismissed that complaint in part, McCaffrey amended her complaint two more times. The latest complaint, the second amended complaint, superseded the earlier complaints and rendered them of no legal effect.[31] The operative complaint is therefore the second amended complaint, and the operative Count I is Count I of the second amended complaint ("Second Count I").

The Second Count I repeated most of the same factual allegations *verbatim* from Count I of the earlier complaints, but made two significant changes. McCaffrey dropped all defendants from the Second Count I except Officer Spencer. McCaffrey also deleted the allegations claiming that "Defendant was an agent, servant, and employee of the [WPD] and the [City] and operated within the scope of his employment," and "Defendant's negligence and recklessness is imputed to the [WPD] and the [City]."[32] The Second Count I no longer alleged liability on the City's part.

McCaffrey argues that the second amended complaint should be read as a whole, and that when read in combination with the assault and battery allegations in Count V, McCaffrey fairly alleged the City's liability for Officer Spencer's unwanted sexual

---

[31] *Bruce E. M. v. Dorothea A. M.*, 455 A.2d 866, 869 (Del. 1983) (pleadings are superseded by amendments); *Grobow v. Perot*, 1990 WL 146, at *4 (Del. Ch. Jan. 3, 1990), *aff'd sub nom. Levine v. Smith*, 591 A.2d 194 (Del. 1991) ("[A]s a general matter, where leave to amend a complaint is granted . . . , the original pleadings are disregarded and all later motions are directed to the amended pleading."); *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171-72 (3d Cir. 2013) (collecting cases); *see also* 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1476 (3d ed. 2008).

[32] Jan. 19, 2011 Compl., ¶¶ 41-42.

13

advances. The Superior Court never considered this argument because McCaffrey did not argue below that the Second Count I could reasonably be construed to place the City on notice that it remained a defendant.[33] Rather, the Superior Court in *McCaffrey I* only considered whether the City could be liable for the car accident. McCaffrey thereafter dropped the City as a defendant in the Second Count I, as well as the *respondeat superior* claim. Count V is also of no help to McCaffrey. McCaffrey conceded that the City was immune from suit under Count V.[34] Therefore, even if we were to address McCaffrey's arguments for the first time on appeal, Counts I and V of the second amended complaint do not state a claim against the City.

## B. Chief Szczerba's Liability Under Count IV For Grossly Negligent And Reckless Hiring, Retaining, And Supervising Officer Spencer

McCaffrey argues the Superior Court erred by granting summary judgment in favor of Chief Szczerba on her state law Supervisory Liability claim. According to McCaffrey, she offered sufficient evidence of Chief Szczerba's wanton negligence to create a genuine issue of material fact whether the wanton negligence exception to immunity should apply to Chief Szczerba. Chief Szczerba and the City argue in response that the evidence offered by McCaffrey relating to Chief Szczerba's supervision of Officer Spencer does not amount to wanton negligence as a matter of law, and therefore the Tort Claims Act immunized Chief Szczerba from suit.

---

[33] *See* Supr. Ct. R. 8.

[34] *McCaffrey II*, at *1 (Del. Super. Aug. 9, 2012) ("[McCaffrey] concedes in her Response to the Motion that the City should be dismissed from Count V of the Complaint alleging assault and battery against both the City and [Officer Spencer] as there are no exceptions in the immunity statute applicable to the City with regard to this tort.").

14

Our review of the Superior Court's grant of summary judgment is *de novo*. This Court must "undertake an independent review of the record and applicable legal principles 'to determine whether, after viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that no material issues of fact are in dispute and it is entitled to judgment as a matter of law.'"[35]

### 1. The Tort Claims Act And Supervisory Liability

In general, municipalities in Delaware are immune from suit for state law claims under the Tort Claims Act. The Act provides: "Except as otherwise expressly provided by statute, all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages."[36] Delaware courts must apply the Tort Claims Act in a manner consistent with its stated legislative intent and the goals behind granting immunity to public officials.[37]

The General Assembly enacted the Tort Claims Act in 1979 in response to several court decisions restricting sovereign immunity for Delaware counties and

---

[35] *DaBaldo v. URS Energy & Constr.*, 85 A.3d 73, 77 (Del. 2014) (quoting *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997)).
[36] 10 *Del. C.* § 4011(a).
[37] *Moore v. Wilmington Hous. Auth.*, 619 A.2d 1166, 1168 (Del. 1993) ("Since the construction of the term depends almost entirely on the context in which it is used, it is first necessary to ascertain the intent of the General Assembly in enacting the legislation."); *Sadler v. New Castle Cnty.*, 565 A.2d 917, 923 (Del. 1989) ("'The Act was not a mere alteration of the doctrine of municipal immunity' but an extension of the doctrine 'to areas where it did not formerly apply' and as to which prior decisional law had cast doubt. Moreover, the section 4012 exceptions are subject to strict construction as derogative of this broad grant of immunity.") (quoting *Fiat Motors of N. Am., Inc., v. City of Wilmington*, 498 A.2d 1062, 1064 (Del. 1985)).

municipalities.[38] As the preamble to the Tort Claims Act shows, the General Assembly was concerned that "the provision of vital local governmental services [had been] placed in substantial jeopardy" and "the cost of insurance, when obtainable, [had] reached proportions unanticipated by local government as a result of the multiplicity of lawsuits filed against local governments in recent years."[39] While striking a balance between individual rights and the interests of society, the General Assembly sought to "discourage lawsuits which might create a chilling effect on the ability of public officials or employees to exercise their discretionary authority."[40]

As public officials, police officers have traditionally enjoyed the protection of governmental immunity.[41] The Restatement (Second) of Torts explains the important policy underpinnings for this protection:

> [P]ublic officers and employees would be unduly hampered, deterred and intimidated in the discharge of their duties . . . if those who act improperly . . . were not protected in some reasonable degree by being relieved from private liability. The basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognition of the need of preserving independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits. This, together with the manifest unfairness of placing any person in a position in which he is required to exercise his judgment and at the same time is held responsible according to the judgment of others, who may have no experience in the area and may be much less qualified than he to pass judgment in a discerning fashion or who may now be acting largely on the basis of hindsight, has led to a general rule that tort liability should not be imposed

---

[38] 62 Del. Laws 124; *Moore*, 619 A.2d at 1168 ("The Act was passed in the wake of two Delaware Supreme Court decisions that essentially eliminated the constitutional defense of sovereign immunity with respect to counties and municipalities.").

[39] 62 Del. Laws 124.

[40] *Doe v. Cates*, 499 A.2d 1175, 1180-81 (Del. 1985) (construing the similar State Tort Claims Act).

[41] *See* 80 C.J.S. *Sheriffs and Constables* § 102 (2015).

16

for conduct of a type for which the imposition of liability would substantially impair the effective performance of a discretionary function.[42]

Like qualified immunity under federal law, immunity under the Tort Claims Act is not merely a "defense to liability," but rather an "immunity from suit" for damages.[43] The United States Supreme Court has observed that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."[44] Where police officers are concerned, immunity "strikes a balance between the need, on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury."[45]

Immunity from suit for damages is not absolute. While exceptions to immunity are narrowly construed,[46] immunity can be lost and a public employee held personally

---

[42] RESTATEMENT (SECOND) OF TORTS § 895D cmt.b (1979); *see also Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949).

[43] *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); 10 *Del. C.* § 4011(a) ("[A]ll governmental entities and their employees shall be *immune from suit* on any and all tort claims seeking recovery of damages.") (emphasis added). Because the Tort Claims Act provides "immunity from suit," and therefore the burdens of litigation, it is important to resolve immunity issues at the earliest possible stage of the litigation. Otherwise, the benefits of such immunity are lost. *See Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009).

[44] *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

[45] *Poe v. Leonard*, 282 F.3d 123, 131 (2d Cir. 2002) (quoting *Locurto v. Safir*, 264 F.3d 154, 162-63 (2d Cir. 2001)).

[46] *See Walls v. Rees*, 569 A.2d 1161, 1167 (Del. 1990).

17

liable "for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent."[47]

### 2. Chief Szczerba And Wanton Negligence

The parties do not dispute that Chief Szczerba was a covered employee and was acting within the scope of his employment. McCaffrey also does not claim "willful and malicious intent" by Chief Szczerba. Therefore the immunity determination hinges on whether he acted with wanton negligence in hiring, supervising and retaining Officer Spencer.

We have defined wanton conduct as "such conduct as exhibits a conscious indifference to consequences in circumstances where probability of harm to another within the circumference of the conduct is reasonably apparent, although harm to such other is not intended."[48] The "conscious indifference" aspect of wantonness requires an "I-don't-care" attitude.[49] Whether conduct is wanton "is ordinarily one for the trier of fact. Only where the facts permit reasonable persons to draw but one inference—adverse to the non-moving party—is a moving party entitled to a finding and judgment as a matter of law."[50]

---

[47] 10 *Del. C.* § 4011(c).

[48] *Wagner v. Shanks*, 194 A.2d 701, 706 (Del. 1963) (quoting *Law v. Gallegher*, 197 A. 479, 482 (Del. 1938)) (emphasis omitted); *see also Jardel Co. v. Hughes*, 523 A.2d 518, 530 (Del. 1987) ("We prefer the term 'reckless indifference' to the term 'wanton,' which has statutory roots now largely extinct.").

[49] *McHugh v. Brown*, 125 A.2d 583, 586 (Del. 1956) ("The nub of this definition is in the phrase 'conscious indifference.' In homely language it means a foolhardy 'I-don't-care-a-bit-what-happens' attitude. . . . It is conscious indifference—the 'don't care' attitude—that characterizes wanton conduct.") (internal citations omitted).

[50] *Eustice v. Rupert*, 460 A.2d 507, 509 (Del. 1983) (citations omitted).

The Superior Court found that McCaffrey failed to present any evidence to create a dispute of material fact whether there had been wanton negligence.[51] Specifically, although the court noted that Chief Szczerba and the WPD were aware of several incidents involving Officer Spencer that could have made him arguably negligent, the fact that the WPD took steps to "reprimand and otherwise discipline Officer Spencer" after each incident precluded any finding of conscious indifference.[52] After careful review of the record, and keeping in mind the purpose behind the Tort Claims Act, we agree with the Superior Court's conclusion.

(i)     Pre-hiring Conduct

Officer Spencer joined the WPD in January 2008. The WPD is a force of roughly 320 officers. Recruits undergo a vetting process before they are hired. Officer Spencer's pre-hiring investigation involved a lengthy written application with numerous required disclosures, a polygraph examination, a background check, and a psychological evaluation. Officer Spencer then spent several months training at the police academy, and went through an eighteen month probationary period. In his application, Officer Spencer disclosed that he had:

---

[51] The Superior Court decided to overlook that fact that Count IV pled only gross negligence, not wanton negligence, against Chief Szczerba.

[52] *McCaffrey IV*, at *8-9. The Superior Court also determined in the context of constitutional supervisory claims that Chief Szczerba did not exhibit "deliberate indifference" in supervising Officer Spencer. Deliberate indifference for purposes of federal qualified immunity has been described as "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997)).

19

- been cited for six minor traffic violations between 2001 and 2007;
- been dismissed from a job at Value City for chasing a shoplifter into the parking lot, in violation of store policy;
- admitted to having used marijuana, which delayed his admission to the police academy; and
- admitted, at various times in the past, to having driven under the influence of alcohol and committed minor traffic violations, and not been caught.

Officer Spencer's background check yielded overwhelmingly positive recommendations from those who were asked about him. The worst anyone had to say was that he could stand to mature. Officer Spencer's polygraph test "showed signs of being truthful." [53] His psychological evaluation revealed no problems, with the psychiatrist commenting that he believed Officer Spencer was a "man of some integrity."[54] Officer Spencer interviewed well and appeared to be a promising candidate. Chief Szczerba's only direct involvement with the hiring process was a final interview with Officer Spencer at the end of the process.[55]

Considering this universe of facts available at the time Officer Spencer was hired, McCaffrey has not offered evidence of wanton negligence by Chief Szczerba when he approved the hiring of Officer Spencer. There was no indication that Chief Szczerba or anyone else in the WPD was "consciously indifferent" to any "reasonably apparent" risks. Most of Officer Spencer's record was positive, and the few items that may have

---

[53] App. to Opening Br. at 91.
[54] App. to Answering Br. at 58.
[55] *See* App. to Opening Br. at 842 ("Q: What's your involvement [with the hiring process]? Chief Szczerba: I conduct the final interview after the written test, physical agility test, oral interview, a background investigation and the final list of candidates, they make it to an interview with me as the chief of police.").

raised flags did not approach the level where allowing him to become a police officer would have been "wantonly negligent." Police departments cannot be expected to reject all candidates with some blemishes on their records.

(ii)     Post-hiring Conduct

During the two years from 2008 to 2010, when he was a Wilmington police officer but before the McCaffrey incident, Officer Spencer was involved in five disciplinary matters:

- In September 2008, Officer Spencer failed to report to work on time and had to be awoken by another officer who drove to his house.
- In October 2008, Officer Spencer responded to a call from a fellow off-duty officer at a Wilmington bar about an altercation and did not properly report the incident.
- In November 2008, Officer Spencer was involved in a domestic dispute with the mother of his child and then, quite upset, drove to his supervisor's house seeking help.
- In April 2010, Officer Spencer was involved in a collision while driving on Route 13 outside of the city, which he failed to report properly to the WPD.
- Also in April 2010, Officer Spencer failed to file the correct report after he discharged a taser.

Each time, the WPD internal disciplinary process investigated and responded to the incidents. Officer Spencer was given written reprimands for all but the automobile collision, for which he was counseled on proper procedures.

There is nothing in the record that shows that Chief Szczerba was or should have been aware of Officer Spencer's alcohol problems before the McCaffrey incident. Officer Spencer's five disciplinary incidents were well documented. McCaffrey points to Chief Szczerba's lack of direct involvement with the discipline of Officer Spencer as evidence that he had an "I-don't-care" attitude. This argument ignores the way the

21

internal discipline structure operates within the WPD. Chief Szczerba is not personally involved with every disciplinary proceeding. The Office of Professional Standards is responsible for investigating incidents involving officers and dispensing appropriate discipline. The Chief of Police's primary role in internal discipline is as a member of a panel that serves as the final arbiter of appeals. Considering this structure, the Chief of Police's lack of personal involvement in every low-level discipline case does not reflect an "I-don't-care" attitude, but instead an understanding and respect for his role in the process. Also, Spencer's incidents of misconduct were relatively minor until the McCaffrey incident in June 2010. This is especially the case because alcohol did not play a prominent part in Officer Spencer's record until after the McCaffrey incident.

(iii)    Hindsight Bias

Importantly, although alcohol *was* involved when Officer Spencer failed to show up to work in 2008 and in the April 2010 collision, and may have been involved in the domestic incident in November 2008,[56] there is no evidence of record that anyone in the WPD was aware that alcohol was involved in the first two incidents until Officer Spencer admitted it during an interview *after* the McCaffrey incident.[57] The domestic incident was not treated as one involving alcohol, as alcohol seemed to play only a peripheral role. Further, Officer Spencer was new to the force in 2008, when three of the incidents

---

[56] The investigative report produced after the incident noted that one of Officer Spencer's female friends "encountered Officer Spencer to be intoxicated and 'talking out of his head,'" and Officer Spencer was forthcoming about the fact that he had had some alcohol the day of the incident. App. to Opening Br. at 150, 153. It is unclear from the record exactly what happened, but the role, if any, that alcohol played was not prominent.

[57] App. to Opening Br. at 366, 367.

occurred. Looking at the evidence in a light most favorable to McCaffrey, at best Chief Szczerba would have been aware of a series of fairly minor disciplinary matters involving a new officer, each of which ended when he was disciplined. None of these incidents are of the type or severity for which McCaffrey seeks recovery.[58]

We agree with the dissent's concerns over events that occurred during and after the June 5, 2010 incident. The conduct alleged in the second amended complaint, much of which was admitted by Officer Spencer and others, raised concerns about Officer Spencer's fitness for duty as a police officer. It also raised troubling questions about the legitimacy of the WPD's response following the incident. But our narrow issue on appeal is whether, without the benefit of hindsight, McCaffrey identified a material issue of disputed fact about whether Chief Szczerba acted with wanton negligence in the hiring, training, and supervising of Officer Spencer, such that Chief Szczerba should be held personally liable for Officer Spencer's actions. We agree with the Superior Court that McCaffrey failed to meet her burden on summary judgment.

### C. The City's Liability Under Count IV For Grossly Negligent And Reckless Hiring, Retaining, And Supervising Officer Spencer

Finally, McCaffrey argues that the Superior Court erred in finding the City immune from suit for the state law negligent and reckless hiring, retaining, and supervising claim. According to McCaffrey, Officer Spencer "used his WPD equipment,

---

[58] *See Jardel*, 523 A.2d at 531 ("Where the claim of recklessness is based on an error of judgment, a form of passive negligence, the plaintiff's burden is substantial. It must be shown that the precise harm which eventuated must have been reasonably apparent but consciously ignored in the formulation of the judgment.").

including his police identification, badge, gun, and magazine during this incident."[59] The City argues in response that a police officer's accoutrements do not fall within the definition of "equipment" under the statute, and, in any event, the City's actions were discretionary and therefore the City is immune from suit.

As noted earlier, the Tort Claims Act provides broad immunity from suit for government entities and public officials. Section 4012 of the Act, however, provides that "[a] governmental entity shall be exposed to liability for its negligent acts or omissions causing property damage, bodily injury or death in . . . its ownership, maintenance or use of any motor vehicle, special mobile equipment, trailer, aircraft or other machinery or equipment, whether mobile or stationary."[60] The exception applies to the use of automobiles, but only when the automobile itself causes harm.[61] It also applies to "instruments which are commonly at the center of tort suits and which, by virtue of their potential to inflict damage and injury when negligently maintained or used, are subject to regulation under our laws."[62]

Officer Spencer's weapon and other items identified by McCaffrey do not fall under the "other machinery or equipment" language in § 4012. The "other machinery or equipment" intended by the statute are the same types of equipment listed in the

[59] Opening Br. at 26.
[60] 10 *Del. C.* § 4012.
[61] *See Sussex Cnty. v. Morris*, 610 A.2d 1354, 1359-60 (Del. 1992) (stating that the "motor vehicle exception in Section 4012(1) applies when the vehicle itself is the instrument of the harm" such as when the plaintiff, who had been involuntarily committed, flung himself from a Sussex County constable's moving vehicle); *Walls*, 569 A.2d at 1167 (declining to extend the definition of "use of any motor vehicle" to include the police seizure of a suspect's vehicle).
[62] *Sadler*, 565 A.2d at 923 (quoting *Sadler v. New Castle Cnty.*, 524 A.2d 18, 24 (Del. Super. 1987)).

remainder of the provision.[63] Even more fundamentally, the items identified by McCaffrey did not cause any "property damage, bodily injury or death" to McCaffrey.[64] The City is therefore immune from suit for McCaffrey's state law claims under Count IV of the second amended complaint.[65]

## V. CONCLUSION

Officer Spencer's conduct on June 10, 2010, much of which has been admitted, was more than just embarrassing conduct by an off-duty Wilmington police officer. He acted unprofessionally—perhaps criminally—and caused a woman great distress. He remains a defendant in the case. But the liability of others for Officer Spencer's off-duty misconduct is a separate issue. After review of the record and the decisions of the Superior Court, and keeping in mind the purpose behind the Tort Claims Act, we conclude that the Superior Court did not err as a matter of law in dismissing McCaffrey's claims against Chief Szczerba and the City.

The judgment of the Superior Court is affirmed.

---

[63] *See id.* (stating that a *ejusdem generis* approach is proper in construing § 4012 because otherwise the "other machinery or equipment" phrase would make the exception too broad, contrary to legislative intent); *see also Hedrick v. Blake*, 531 F. Supp 156, 158 (D. Del. 1982) (finding that the General Assembly did not intend that an officer's nightstick as used in the way presented be considered "in the same category of 'negligent acts or omissions' as the municipality's 'ownership, maintenance or use' of the equipment described in § 4012(1)"); *White v. Crowley*, 1986 WL 5850, at *3-4 (Del. Super. May 8, 1986) (predating this Court's instruction in *Sadler* but applying the same approach to find that handcuffs are not "equipment" within the meaning of the statute because they are not of the same type as the items listed in § 4012—"vehicles which may be used to transport people or property").

[64] 10 *Del. C.* § 4012.

[65] Because we have found no exceptions to immunity under § 4012, we need not reach the alternative argument that the City's hiring, supervision, and retention of Officer Spencer is a discretionary act and therefore immune from suit under § 4011.

25

**STRINE**, C.J, concurring in part and dissenting in part.

I join the excellent Majority opinion, except in one respect. Wanton negligence is a very, very difficult standard to fall short of. The definition requires that the person facing liability to act with "a 'conscious indifference' or an 'I-don't-care attitude.'"[1] I respect the judgment of my colleagues in the majority that the Superior Court did not err in finding that there was no triable issue of fact as to whether Chief Szczerba could be held liable under that standard given the facts of record. But, I reluctantly come to a different judgment.

The principal argument that Chief Szczerba uses to argue in his own favor is ignorance. That is, Chief Szczerba argues that he was the chief of a very large police organization and that it should be expected that he would not personally superintend the disciplinary process governing line officers. Even further, although correspondence would be addressed to him, he was not expected to read it. Nor, apparently, was he charged with ensuring that if he did not read it, there was a genuine system of officer supervision and discipline that functioned credibly and in good faith, to protect the public, especially given the reality that police officers have special powers, get to carry lethal force, and get to drive automobiles in the line of duty in ways that members of the public cannot.

---

[1]*Adams v. Selhorst*, 779 F. Supp. 2d 378, 395 (D. Del. 2011) (quoting *Foster v. Shropshire*, 375 A.2d 458, 461 (Del. 1997)) (discussing 10 *Del. C.* § 4011(c)); *see also Wagoner v. Shanks*, 194 A.2d 701, 707 (Del. 1963) (defining wanton as "the 'I don't care attitude'"); *Hedrick v. Webb*, 2004 WL 2735517, at *7 (Del. Super. Nov. 22, 2004) ("Wanton conduct reflects a 'conscious indifference' or an 'I don't care attitude.'").

The facts of record here are troubling. For starters, when Officer Spencer was hired, he hardly came to the force with an unblemished record. Although it can be deemed admirable that the Wilmington Police force would take on an officer with multiple motor vehicle violations, prior drug use, and a drinking problem, one would think that it would then consider that history when Officer Spencer then fell short of the mark when he became an officer. But, when Officer Spencer began to engage in a pattern of behavior that suggested that his pre-hiring behaviors were recurring, there is no evidence that anything genuine was done to correct his behavior.

In three successive months in 2008, Officer Spencer got into trouble. After each instance, he got a written reprimand, which was not accompanied by any requirement that he undertake treatment, demonstrate that he had changed his behavior, or face any real consequence. These incidents are notable.

Let's consider them in turn. In September 2008, Officer Spencer did not show up to work on time. His superiors tried to roust him by phone. Twice that was tried.[2] But Officer Spencer did not answer his phone. Thus, an officer was dispatched to his home to see if he was there. It took that door knocking to get him out of bed. Although Officer Spencer initially claimed that he forgot to set his alarm clock—an excuse that does not explain why he did not answer his ringing phone—he later acknowledged that he had

---

[2] *See* App. to Opening Br. at 121 (Notification of Complaint) ("At approximately 0805 hours, your Field Training Officer (FTO) . . . attempted to contact you via your provided telephone number which met with no response and it went directly to voice mail as if your phone was in off mode. This writer . . . also attempted to contact you with negative results and then verified you were not off on compensatory time or vacation.").

2

been out drinking and at "a club" the night before.[3] When all was taken together, Officer Spencer's police superiors had several hints that he had missed his shift because he was too hungover to make it to work.

Then, in October, Officer Spencer was reprimanded for his investigation involving a physical altercation between three off-duty officers and a civilian at a Wilmington bar. One of the off-duty officers summoned him via text message.[4] Officer Spencer violated Wilmington Police Department protocol by not notifying dispatch that he was going to the location, not interviewing any of the three off-duty officers, and otherwise failing to properly investigate the incident.

And then, in November, Officer Spencer's girlfriend had a fight with his daughter's mother at his home. Officer Spencer's girlfriend alleged that he "placed his hands on" his daughter's mother.[5] His girlfriend called the Wilmington Police Department, which sent an officer to investigate. Officer Spencer's girlfriend told the investigating officer that she had "encountered Officer Spencer to be intoxicated and 'talking out of his head.'"[6] Officer Spencer then "grabbed [his] gun," left his house, and

---

[3] *See id.* at 689 (Deposition of Michael Spencer, Oct. 19, 2012) ("Q. Was alcohol involved in that incident? A. The reason I was late to work? Q. Yes. A. I was hanging out the night before, went to a club, went to Trolley Square, and woke up late for work. Q. You didn't attribute that to alcohol at all? A. I mean, it may have played a part. I'm not saying it was the sole reason.").

[4] *See id.* at 138 (Citizen Complaint Investigative Report) ("[B]y Officer Spencer's own admission, he was texted by the off-duty officers with a message saying 'Dude, I'm going to fuck this guy up, come quick.'").

[5] *Id.* at 150 (Citizen Complaint Investigative Report).

[6] *Id.*

drove to his superior's home, where he showed up unannounced.[7] That is, Officer Spencer—while appearing drunk—got in a vehicle with his weapon and drove off. When he got to his superior's home, Officer Spencer "seemed highly upset and was crying."[8] Despite a finding that Officer Spencer did not violate the Department's directive on domestic violence, he was reprimanded for failing to inform the appropriate officer about the domestic dispute at his ex-girlfriend's home. What is notable about each of these incidents is that they seem to involve a lack of judgment, a propensity to mix the use of alcohol with driving and the carrying of a gun, and the notion that situations involving police officers should be handled differently than those involving ordinary citizens.

Admittedly, Officer Spencer then had a period of nearly eighteen months in which he did not get disciplined. During that period, he was allowed to proceed from probationary status to full patrolman. But, then, on April 3, 2010, there was another incident. Officer Spencer had been drinking alcohol at the Delaware Association of Police. He then drove off in a police car and rear ended another vehicle. The State Police investigated the accident, and cited Officer Spencer for inattentive driving because he had been texting. And Officer Spencer failed to contact the watch commander in violation of the Department's protocol that an off-duty officer involved in an accident in New Castle County do so.

Then came the night which occasions this case. Officer Spencer's behavior that evening can only be described as creepy at best, and incredibly scary and criminal at

---

[7] *Id.* at 691 (Deposition of Michael Spencer, Oct. 19, 2012).
[8] *Id.* at 152 (Citizen Complaint Investigative Report).

4

worst. On the evening of June 4, 2010, Officer Spencer attended a "Beef and Beer" police fundraising event, at which he consumed at least three different kinds of alcohol.[9] He then drove under the influence of alcohol to a bar in Trolley Square.[10] After leaving that bar—and again driving under the influence[11]— Officer Spencer headed toward a friend's house. At 2:00 a.m. on June 5, 2010, he drove through a red light and struck Morgan McCaffrey's vehicle.

After the accident, Officer Spencer called WPD dispatch. The dispatcher who took Officer Spencer's call "could tell that he might be drunk because the way he was acting on the phone and the way he was talking."[12] But, the dispatcher did not inform his supervisor about the call because "he didn't want to get the officer in trouble."[13] While waiting for the police to arrive, Officer Spencer kissed McCaffrey on the lips and "asked Ms. McCaffrey whether she would like to handle the matter civilly."[14] She agreed, and Officer Spencer cancelled the call to the police. Officer Spencer then asked McCaffrey if they could go to her nearby apartment to discuss the accident and she said that they could.

---

[9] *Id.* at 660 (Deposition of Michael Spencer, Oct. 19, 2012) ("Q. Also, I'll represent in the records you stated that you drank beer, Captain Morgan and some other mixed drink. Would that be your normal -- A. That's not my normal, but if that's what I said I had that evening then that's what I had.").

[10] *See id.* at 660–61 ("Q. When you left the beef and beer were you driving under the influence of alcohol? A. Yes, because I had consumed alcohol at the beef and beer.").

[11] *See id.* at 662 ("Q. When you left Catherine Rooney's would you say you were driving under the influence of alcohol? A. Yes.").

[12] *Id.* at 738 (Deposition of Christopher M. Partlow, Jan. 10, 2013).

[13] *Id.* at 441–42 (Departmental Information Report, June 16, 2010).

[14] *McCaffrey v. City of Wilmington*, 2014 WL 6679176, at *2 (Del. Super. Nov. 3, 2014).

Once inside McCaffrey's apartment, McCaffrey went into her bathroom. When she came out a few minutes later, Officer Spencer was naked on her bed.[15] Officer Spencer asked McCaffrey whether she wanted to have sex, and she said no. He then straddled McCaffrey on her bed and again asked her if she wanted to have sex, and she again said no. McCaffrey then went back into her bathroom. When she came out five minutes later, Officer Spencer was asleep on her bed.

McCaffrey called the police. Four WPD officers responded to her call, and McCaffrey gave these officers Officer Spencer's gun, magazine, and police badge, which he had given her earlier in the night. The officers then "questioned Ms. McCaffrey in a way that indicated that the officers were unsympathetic to Ms. McCaffrey's concerns and fears. It also appears that the officers did not believe Ms. McCaffrey's version of events because she was a female and Officer Spencer was male and a WPD officer."[16]

The officers woke Officer Spencer, but failed to perform any field sobriety tests on him immediately. Spencer smelled of alcohol and initially tried to put his shirt on as pants.[17] The responding officers took him from McCaffrey's apartment to Wilmington Hospital at 5:00 a.m. He was released at 5:39 a.m. and finally questioned by an officer at

---

[15] *See* App. to Opening Br. at 287 (Departmental Information Report, June 6, 2010) ("Upon entering the apartment, this officer observed Ptlm Spencer laying naked on the bed covered by a sheet.").

[16] *McCaffrey*, 2014 WL 6679176, at *3.

[17] *See* App. to Opening Br. at 287 (Departmental Information Report, June 6, 2010) ("Sgt. . . . flashed his light into Ptlm Spencer's face several times to awaken him, however he did not [wake up]. This officer then yelled his name at which point, he finally came too and appeared to be extremely groggy from alcohol. There was an odor of alcohol coming from his person and his eyes were blood shot. This officer handed him his clothes so he could get dressed. Ptlm Spencer attempted to put a short sleeve white shirt on by putting his legs through the shirt instead of over his head.").

7:15 a.m.  After initially refusing any field sobriety tests, he eventually complied and was given and passed eight tests.  At his deposition, Officer Spencer said that he did not remember taking any of these tests.[18]

Now, of course, Chief Szczerba will say, I knew nothing about this and would not tolerate this kind of behavior.  But what is the record evidence of how the organization he ran responded that night, and especially that of the captain who involved himself?  One of the responding officers, a lieutenant, called the on-call captain at 4:30.  Because Officer Spencer was visibly drunk enough that the responding officers decided to take him to the hospital, the lieutenant wanted to test Officer Spencer's blood for alcohol immediately.  But, the captain instructed her—not once, not twice, but three times—to hold off on testing him.[19]  Consequently, no officer performed any field sobriety or blood alcohol tests on Officer Spencer until six hours after the accident.  And, according to McCaffrey, the responding officers treated her with disrespect and made her wait until 8:00 a.m. to be interviewed about the incident.

---

[18] *See id.* at 669 (Deposition of Michael Spencer, Oct. 19, 2012).

[19] *See id.* at 425 (Statement of Lieutenant) ("At 0429 hours, I notified the Duty Captain, . . . to advise him of the situation.  I stated to [the captain] that I wanted to take blood since [Officer Spencer] had been drinking. [The captain] denied this request by stating that we can wait on that because he wanted to notify the Office of Professional Standards.  I stated to [the captain] that my window was closing on my time to draw blood."); *id.* at 425–26 ("At 0504 hours, I telephoned [the captain] to advise that Spencer was awake and there was evidence of blood on his shirt. [The captain] advised to transport Spencer to the hospital to make sure he is ok.  For the second time, I advised [the captain] that I wanted to take blood or put Spencer on the box. [The captain] again denied my request and advised me to wait for the Office of Professional Standards to arrive."); *id.* at 426 ("At 0526 hours, I notified [the captain] again about my timeline with putting Spencer on the box or drawing his blood.  [The captain], a third time denied my request by stating that John and Paul were enroute to handle.").

7

Of course, it is of more limited relevance what happened after that fateful night, but not of no relevance. Officer Spencer was suspended without pay for thirty-one days and given one year of probation for any like offenses involving the consumption of alcohol. But, unfortunately, Officer Spencer's suspension did not mark an end to his misbehavior. In August 2010, he was disciplined for negligently damaging a police vehicle following a car chase. In November 2013, according to McCaffrey, Officer Spencer was charged with a DUI after having a blood alcohol content almost four times the legal limit. Still he kept his badge. Finally, judicial notice can be taken that in June 2015, Officer Spencer drunkenly broke into a home in Middletown, believing it to be his own.[20] Officer Spencer, by then a WPD corporal, was placed on administrative duty after being charged in the break-in.[21]

Given this record, I reluctantly conclude that there is a triable issue of fact whether Chief Szczerba acted with wanton negligence. It can only be a defense to know nothing, if you know nothing because you take good faith efforts to ensure that the system below you functions in good faith and credibility. It is only a defense to not reading your mail if you ensure that someone else beneath you does and is charged with acting in good faith on the substance of what is communicated.

---

[20] *See* Brittany Horn & Esteban Parra, *Wilmington Officer Charged With Breaking Into Home*, THE NEWS J., June 10, 2015, *available at* http://www.delawareonline.com/story/news/crime/2015/06/08/wilmington-officer-charged-breaking-home/28720215/?from=global&sessionKey=&autologin=.
[21] *Id.*

8

Here, there exist large questions as to the credibility of the officer discipline process that raise a fact question about the good faith of that process and the tone set at the top of the organization. Huge red flags regarding the repeated, inappropriate use of alcohol by Officer Spencer were not followed up on by officers who were trained to be on the lookout for suspicious behavior. It does not take a great detective to smoke out a hangover on the part of someone who can't wake up when multiple calls to his house are made, and who comes to the door only after an officer goes and bangs on it. What citizen gets arrested for "inattentive driving" after having a few drinks and does not get tested for alcohol use? What is a police culture where an officer responds to a bar fight and does not follow up because some of the participants are fellow officers? In what state of the world is no field sobriety or blood alcohol test timely given when a male gropes a female, undresses and climbs on top of her in her bed, and falls asleep drunk there in her home? In what state of the world does a police captain—a high ranking officer—get involved in whether officers at the scene follow regular order?

The issues here of culture and credibility of the system were slighted by the Superior Court. That is understandable because the wanton negligence standard is high and it is easy to see why the narrow focus would be on precisely what Chief Szczerba knew about each incident and when. But what is lost in that are a few things. First, it is a jury question whether Chief Szczerba was telling the truth when he said he did not read things. Second, not reading your mail raises as many questions as it answers. Many of us who grew up in the Seventies and watched reruns on UHF channels had affection for

9

the bumbly Sergeant Schultz,[22] but that defense is one for a jury, not a Rule 56 victory. Third, when someone is subject to five actions for discipline, particularly three in three months, and has a prior history of problems, a question is raised about why a system has no triggers to identify chronic offenders and to ensure their repetitive behaviors are addressed. Fourth, the instances in which Officer Spencer was disciplined raise serious questions themselves of a "broom" approach to investigation. In each instance, it seems like the sort of skeptical and thorough approach to investigation that police usually take when investigating ordinary citizens was dispensed with when dealing with Officer Spencer. Red flags were not followed up on, questions were not asked, and Officer Spencer's word was taken (or not even solicited). Finally, it appears that no weight was given to what the behavior of high-ranking subordinates of Chief Szczerba on the critical night said about Chief Szczerba's own good faith in overseeing the officer discipline process and the culture he instilled.

The reality is that a reasonable juror could conclude that the boorish, creepy, and dangerous behavior of Officer Spencer on the night in question—one where a heavy use of alcohol influenced the use of a motor vehicle and the power that comes with being a police officer in a way that endangered the public—was not unexpected of Officer Spencer. To the contrary, it was exactly the kind of knucklehead, irresponsible, and stupid behavior that his prior course of conduct might predict would eventually occur. It

---

[22] *Hogan's Heroes* (CBS television broadcast Sept. 17, 1965) ("I hear nothing, I see nothing, I know nothing!").

10

may be that a jury, upon a fuller explanation, would conclude that Chief Szczerba acted in a way that could not be considered wantonly negligent.

But, it also may be that the jury would conclude that Chief Szczerba was conscious that the officer disciplinary process over which he presided was not operating in good faith; operated because it had to, and worked to sweep serious problems under the rug, leaving the public at risk of dangerous encounters with officers with serious personal and behavioral problems that made them unfit to wield deadly force.[23]

It is not an easy thing to prove wanton negligence. But, the record here is troubling enough to at least create a jury question that should not be answered by a judge on a summary judgment motion. I respect that my colleagues in the majority have reached a different conclusion in good faith, and I wish I could join them. The facts of record, however, are too unsettling to allow me to do so.

---

[23] My respected colleagues in the Majority suggest that there is no triable issue of fact regarding whether Officer Spencer's repeated problems could be traced to alcohol abuse in real time, rather than in hindsight. I respectfully part company on that point. It may well be the case that a jury would find that each incident was properly investigated in the same manner in which inquiring minds like detectives and officers on the beat deal with citizens in situations where alcohol use is frequently associated with problematic human behavior. But, to my mind at least, a fact question exists as to whether the discipline system overseen by Chief Szczerba was one that, as a regular matter, applied a different investigative standard when it examined officer behavior than it used when investigating citizen behavior. As the Majority itself cites, there are several undisputed examples of just that in this record, which include behavior by Officer Spencer himself, by a police dispatcher, and by a police captain. A jury should decide whether any lack of knowledge was the result of something being undiscoverable, mere negligence, or a pattern of institutional indifference amounting to wanton negligence on the part of Chief Szczerba.