IN THE SUPREME COURT OF THE STATE OF DELAWARE

TIFFANY GREENFIELD,
as Next Friend and Guardian *ad litem*
for ETHAN FORD, a minor,

§
§
§
§

No. 143, 2018

Plaintiff Below,
Appellant,

§
§
§
§

Court Below—Superior Court
of the State of Delaware

v.

§
§
§

C.A. No. N16C-07-115

DFS DIRECTOR LAURA MILES,
*individually and in her official capacity*;
DFS DIRECTOR VICTORIA KELLY
PSY.D, *individually and in her official
capacity*; FAMILY CRISIS
THERAPIST TRINA N. SMITH,
*individually and in her official capacity;*
JAMIE ZEBROSKI M.S.W.,
*individually and in her official capacity
as a Supervisor for DFS*; CRYSTAL
BRADLEY, M.S., *individually and in
her official capacity as a Senior Family
Services Specialist for DFS*; NANCY
CRAIGHTON, *individually and in her
official capacity as a Supervisor for
DFS,*

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Defendants Below,
Appellees.

§
§

Submitted: March 6, 2019
Decided:    May 30, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**,
Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court.  **AFFIRMED.**

Andrew C. Dalton, Esquire (argued) and Bartholomew J. Dalton, Esquire; DALTON & ASSOCIATES, P.A., Wilmington, Delaware; Attorneys for Plaintiff Below, Appellant.

Joseph C. Handlon, Esquire (argued) and Wilson B. Davis, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware; Attorneys for Defendants Below, Appellees.

**TRAYNOR**, Justice, for the Majority:

This is an appeal from the Superior Court's dismissal of a lawsuit brought on behalf of a minor, Ethan Ford, by his guardian, Tiffany Greenfield,[1] against three child-welfare workers and their supervisors.[2] Greenfield alleged that the defendants, who worked for the Delaware Division of Family Services ("DFS"),[3] contributed in one fashion or another—some as case workers, others as managers and supervisors—to four faulty investigations of reports that Ford and his half-sister, Autumn Milligan, were being abused and neglected by their mother, Tanasia Milligan. According to Greenfield's complaint, the defendants' dereliction of duty resulted in the tragic death of Autumn and permanent and irreversible damage to Ford—damage that necessitates long-term physical care and psychological services.

But what was once a sprawling complaint against two former DFS Directors, three DFS supervisors, and three DFS caseworkers that included claims of negligent hiring, retention, and supervision of the caseworkers by their supervisors is now a case against just two of the caseworkers, Trina Smith and Crystal Bradley, and their direct supervisors focused solely on their direct involvement in their investigations. In 2009, Smith was assigned to investigate Tanasia's care of the new-born Ford when

---

[1] Greenfield is Ford's maternal aunt.

[2] Greenfield has not challenged the Superior Court's dismissal of her claims against Javonne Rich, another DFS case worker.

[3] DFS is a division of the State of Delaware's Department of Services for Children, Youth and their Families.

a hospital test detected marijuana in his system. After a visit to the home where Tanasia lived with Ford, Smith concluded that Ford appeared to be "well-cared for"[4] and closed her investigation. Five years later, Bradley was the designated caseworker charged with investigating Tanasia after she and her boyfriend—both apparently under the influence of drugs—appeared at Greenfield's house to pick up Ford and Autumn. After a seven-week-long investigation, during which Bradley met with Tanasia and her children "multiple times" and spoke with Tanasia by phone on six additional occasions, Bradley and her supervisor "moved [the case] into treatment."[5]

Because Smith, Bradley, and their supervisors were public employees, Greenfield's claims are subject to the Delaware State Tort Claims Act,[6] which immunizes public officers and employees against claims based on the performance of official duties that involve the exercise of discretion unless the act or failure to act causing the alleged harm was not done in good faith or was performed in a grossly negligent manner. Greenfield has not alleged bad faith, and the Superior Court determined that the investigations conducted by Smith and Bradley involved the exercise of discretion and that Greenfield had not alleged facts supporting an

---

[4] First Amended Complaint ("Complaint") ¶ 13, *Greenfield, et al. v. Budget of Delaware, Inc., et al.*, N16C-07-115 (Del. Super. Mar. 24, 2017), Dkt. No. 20, *available at* Second Am. App. to Opening Br. A73–94.
[5] *Complaint*, *supra* note 4, at ¶ 20.
[6] 10 *Del. C.* § 4001 *et seq.*

inference of gross negligence.  Accordingly, the court ruled that Greenfield failed to state a claim for relief under Superior Court Civil Rule 12(b)(6) and entered an order of dismissal.  The Superior Court also dismissed related civil-rights claims that were based on the same allegedly inadequate investigations.

Preliminarily, we state the obvious.  The DFS caseworkers' efforts to ensure the safety of Tanasia's children, Autumn and Ford, failed with doleful consequences.  And in cases such as this, the same humanity that causes our hearts to break when we hear of the mistreatment of a child also cries out and demands that those who are responsible for the needless suffering be held to account.  But it is worth stressing that the claims we are called upon to assess in this case have not been made against the person at whose hands Autumn and Ford suffered.  Instead and for reasons that we do not fault, Ford's guardian seeks redress from individuals who were charged with protecting him but who were unable to do so.  Those same individuals, however, are also required to preserve and foster the family unit, which creates an obvious tension between their duties that requires the exercise of judgment.

Under such circumstances, our law requires that complaints against such individuals be written to a higher standard.  We agree with the Superior Court that Greenfield's complaint did not satisfy that standard and therefore affirm.

# I.    BACKGROUND[7]

Tanasia Milligan was the custodial parent of Ethan Ford and his younger half-sister, Autumn Milligan.  During the five-and-a-half years between Ford's birth and Autumn's tragic death,[8] DFS conducted four separate investigations of reports that Tanasia was abusing and neglecting Ford and Autumn.

## A. January 2009

DFS conducted its first investigation following Ford's birth in January 2009 when hospital tests detected marijuana in Ford's system.  Tanasia admitted that she had smoked marijuana during her pregnancy because it helped with her nausea.  Trina Smith was the caseworker assigned to this investigation.  Smith's supervisor was Nancy Craighton.  At that time, Laura Miles was the Director of DFS.

According to Greenfield's Amended Complaint ("Complaint"), "Smith and Craighton identified the following concerns and risk factors: (1) possible substance abuse; and (2) lack of cooperation with recommended services."[9]  Smith attempted to schedule a meeting with Tanasia "for a drug evaluation."[10]  It is unclear from the Complaint whether an evaluation was completed, but it is alleged that "a drug screen

---

[7] These facts are drawn from the Complaint, *supra* note 4.
[8] Although not described in the Complaint, Autumn's death was evidently the result of physical trauma at the hands of Tanasia.
[9] *Complaint*, *supra* note 4, at ¶ 13.
[10] *Id.*

was never completed."[11]  Smith visited Tanasia's home and determined that Ford "was well-cared for."[12]  This investigation was closed—allegedly by Smith and Craighton—after forty-one days as "unsubstantiated with concern."[13]  Neither Smith nor Craighton had any further interaction with Tanasia or her children.

## B. September 2012

Three-and-a-half years later, DFS opened its second investigation after receiving a report that Ford and Autumn were "found outside after midnight in diapers."[14]  The investigation disclosed that Tanasia's 16-year old brother was babysitting the children and had fallen asleep.  The caseworker, who is not identified in the Complaint, assigned the case a low priority.  The caseworker met with Tanasia on two occasions, during one of which Ford and Autumn were present.  Although the caseworker determined that the children were developmentally delayed and referred Tanasia to programs, Tanasia did not follow through or have Ford and Autumn evaluated.  According to the Complaint, "[a]fter six (6) failed attempts to follow-up with [Tanasia], the caseworker closed the case within 55 days as

---

[11] *Id.*

[12] *Id.*

[13] *Id.*  The root cause analysis that Greenfield included in her appendix on appeal but did not incorporate into her complaint states that "unsubstantiated with concern" is undefined.  A300.  We note, however, that the Delaware Code of Regulations defines the appellation "unsubstantiated with concern" as a term applied to cases where DFS determines that "substantiation proceedings for that incident of abuse or neglect are not warranted or justified, but that there are reasons for concern." 7 Del. Reg. 340 (Sept. 2003), *codified at* 9 Del. Admin. C. § 300-11.3.

[14] *Complaint, supra* note 4, at ¶ 14.

'unsubstantiated with concern.'"[15] The Complaint does not identify the caseworker or allege that any of the defendants were involved in any capacity in this second investigation.

## C. Spring 2013

In the spring of 2013, DFS opened a third investigation following a report from an unidentified source that "the children were locked in a room for long periods of time and could not communicate appropriately."[16] The Complaint does not disclose the identity of the caseworker assigned to this investigation or state whether any evidence tending to support the report was uncovered. The investigating caseworker who is alleged to have been working under the supervision of DFS Director Kelly, "met with [Tanasia], twice with [Ford] and Autumn present, and determined that the children were clean and well fed, but developmentally delayed."[17] The case was closed as unsubstantiated after forty-six days. The Complaint alleges that a caseworker failed to fill out a risk assessment form in accordance with DFS policy, which led to the case being closed prematurely.

Before moving on to the fourth and final investigation, we pause to observe that, up to this point, contrary to the Complaint's labeling of the first three cases as showing a "pattern of neglect and abuse," with the exception of Ford's positive

---

[15] *Id.*
[16] *Id.* at ¶ 15.
[17] *Id.*

8

marijuana test at birth, the Complaint does not affirmatively allege that any of these investigations had substantiated that abuse or neglect had occurred.

### D. Fall 2013

By the fall of 2013, Tanasia and her children were living at the Budget Motor Lodge ("Budget") with Willie Reeder, whom the Complaint describes as Tanasia's "boyfriend and 'pimp.'"[18] The Complaint says that other residents of the motel later reported that Tanasia "often hit her children for misbehaving and that both children were often locked in the motel room alone."[19] The Complaint does not allege, however, that DFS knew of those conditions until later.

### E. April 2014

The fourth and final DFS investigation was opened in early April 2014 after Tanasia and Reeder appeared at Greenfield's house to pick up the children while under the influence of drugs. Greenfield resisted but Reeder "barged in the home and took the children."[20] Greenfield and Tanasia's other sisters called the child-protection hotline, which prompted the opening of an investigation.

This time, Crystal Bradley, a senior family services specialist, was assigned to the case under the supervision of Jamie Zebroski. Over a period of fifty-two days, Bradley met with Tanasia and her children "multiple times"[21] and spoke with Tanasia

---

[18] *Id.* at ¶ 17.
[19] *Id.*
[20] *Id.* at ¶ 18.
[21] *Id.* at ¶ 19.

9

by phone six additional times. The Complaint notes, however, that on four occasions, Tanasia could not be reached by phone. Additionally, the Complaint alleges that "caseworkers failed to interview motel residents or other collateral contacts that could have been helpful in providing the information needed to adequately investigate the claims by [Tanasia]'s sisters that she was neglecting and abusing [Ford] and Autumn."[22] The Complaint also notes that "the sisters mentioned marks on the children's bodies"[23] and that the caseworkers' notes did not indicate that an examination was ever completed.

Unlike the three previous investigations, this case was moved into treatment to address numerous concerns and risk factors, including the possibility of drug and alcohol abuse; mental health factors; appropriate parenting/discipline; housing conditions; the children's developmental delay; and the children's medical and educational needs. According to the Complaint, Tanasia permitted DFS to send the children to a pediatrician and agreed to undergo drug screening but "later failed in many respects to comply with the caseworker's prescribed, mandatory treatment plan for her and the children."[24]

### F. Autumn's death

The Complaint alleges that:

---

[22] *Id.*
[23] *Id.* at ¶ 18.
[24] *Id.* at ¶ 17.

[l]ess than three months after [Tanasia]'s fourth DFS so-called "investigation," and as a direct and proximate result of the gross negligence, dereliction of duty, and recklessness by the individual caseworkers and their respective supervisors, directors and agents, acting under the color of state law, by and through the extraordinary grant of authority to DFS and its staff, Autumn Milligan is dead, and Ethan Ford was permanently and irrevocably damaged in ways that are impossible to know the full scope of at the present time, certainly will result in the need for, *at the very least*, long-term care and psychological services throughout his life.[25]

The Complaint itself does not allege any further details about Autumn's death such as the direct cause of death[26] nor does it draw any connection between Autumn's death and Ford's alleged damages, though Greenfield's opening brief on appeal does provide a brief description of how Autumn died. In any event, after Autumn's death, Ford was removed from Tanasia's custody and placed under the legal guardianship of the State and the physical custody of Greenfield.[27] Greenfield received permanent legal guardianship on January 21, 2016 after a proceeding in Family Court.[28]

## G. Greenfield's pleadings in the Superior Court

Although Greenfield was now Ford's guardian and entitled to some access to DFS's files on the four cases in which Ford was involved, Greenfield did not seek to

---

[25] *Id.* at ¶ 22 (emphasis in original).
[26] Although the Complaint characterizes Autumn's death as the "direct and proximate result" of the caseworkers' actions and inactions, we do not understand the Complaint to suggest that DFS directly mistreated Autumn in a way that led to her death.
[27] Second Am. Opening Br. 10.
[28] Second Am. App. to Opening Br. A234–35.

obtain any of those files.[29] Instead, Greenfield, acting as Ford's next friend and guardian *ad litem*, filed a complaint without the benefit of those files in Superior Court in July 2017, naming as defendants two former DFS directors (Miles and Kelly); three caseworkers (Smith, Bradley, and Javonne Rich); one DFS supervisor, (Zebroski); and Budget of Delaware, Inc., the holding company for Budget. The original complaint purported to state claims against these individuals for (1) negligence, gross negligence and recklessness; (2) civil rights violations under the United States and Delaware Constitutions; (3) a "state-created danger" claim; (4) negligent, grossly negligent, and reckless hiring, retention and supervision; (5) intentional infliction of emotional distress; and (6) negligent infliction of emotional distress.[30]

The DFS employees moved to dismiss arguing that Greenfield's claims were time-barred under 10 *Del. C.* § 8119; that the DSTCA required her to plead gross negligence as to her tort claims and she had failed to plead particularized facts supporting her gross negligence allegations as required by Superior Court Civil Rule 9; that she had failed to identify particular defendants who performed the investigations to permit her § 1983 claims to go forward; and that her claims against the DFS employees in their official capacities were barred by sovereign immunity.

---

[29] Oral Arg. 42:00–45 (Mar. 6, 2019).
[30] Count VI, negligent infliction of emotion distress, was brought solely against Budget.

12

In February of 2017, the Superior Court granted the motion to dismiss, finding merit in all grounds asserted in the motion, save the statute-of-limitations ground, the resolution of which the court found was unnecessary. The court, however, granted Greenfield leave to file an amended complaint to cure the pleading deficiencies.

Greenfield filed her amended complaint a month later, alleging the same claims that were in the original complaint but also providing additional factual detail and allegations that, in some instances, identified the specific DFS worker who performed—or failed to perform—the acts that formed the bases of her claims. The amended complaint also added Craighton as a defendant. Once again, the DFS employees moved to dismiss.

**H. The Superior Court's dismissal**

The Superior Court again dismissed Greenfield's complaint, this time parsing the claims one-by-one against the DFS caseworkers (Smith and Bradley)[31] and their supervisors (Kelly, Miles, Craighton, and Zebroski).

*i. Smith and Bradley*

The court first examined and dismissed the allegation that Smith and Bradley were negligent, grossly negligent, and reckless in the performance of their duties

---

[31] At oral argument in the Superior Court, Greenfield conceded that she had failed to make any factual allegations to support her claims against Rich. Therefore, the Superior Court dismissed all claims against Rich. As mentioned, Greenfield has not appealed that dismissal.

during the 2009 and 2014 investigations. As mentioned, because Smith and Bradley were public employees, the court first addressed whether the DSTCA precluded this claim. It determined that the tortious actions of Smith and Bradley alleged in the Complaint involved the exercise of discretion and therefore claims based on those actions were barred unless performed in a grossly negligent or reckless manner. Finding that Smith's and Bradley's "single and limited investigations [] [were] too far removed from the end result, either temporally, qualitatively, or causally to rise to the level of gross negligence,"[32] the Superior Court dismissed the claims of negligence, gross negligence, and recklessness against them. In a similar vein, the Superior Court concluded that the Complaint did not come close to pleading facts that supported the claims against Smith and Bradley for the intentional infliction of emotional distress.

The Superior Court also dismissed Greenfield's state-created-danger claim, finding that Greenfield had failed to plead any of the four elements of that claim. The Superior Court also found that Greenfield waived her other § 1983 claims because she had failed to address them in her briefing. Accordingly, it dismissed all claims against Smith and Bradley.

---

[32] *Greenfield for Ford v. Budget of Delaware, Inc. et al.*, 2017 WL 5075372, at *3 (Del. Super. Oct. 31, 2017).

## ii. *Kelly, Craighton, Miles, and Zebroski*

The Superior Court also dismissed all claims against the supervisors Kelly, Craighton, Miles, and Zebroski. First, the Superior Court found that none of them had a duty to Ford to supervise, hire, or train DFS employees. Second, because the line workers had not been performing ministerial acts and were not grossly negligent, the Superior Court reasoned that their supervisors could not have been performing ministerial acts or acting with gross negligence either. Third, as with Smith and Bradley, the Superior Court found that the alleged conduct "does not remotely meet the pleading standard for [intentional infliction of emotional distress]."[33]

## iii. *10* Del. C. *§ 8119*

After concluding that the above reasons sufficed for dismissal, the Superior Court also found that the statute of limitations applicable to this case, 10 *Del. C.* § 8119, would have barred Greenfield's claims. Section 8119 provides for a two-year time limit on personal injury actions and begins to run when "such alleged injuries were sustained."[34] The Superior Court determined that § 8119 began to run with the closing of DFS's last investigation on May 29, 2014. According to

---

[33] *Id.* at *4.
[34] 10 *Del. C.* § 8119.

15

the Superior Court, the statute of limitations thus had run by the time Greenfield filed this action on July 15, 2016.

## I. Greenfield's claims on appeal

On appeal, Greenfield presses four arguments relating to her gross negligence and state-created-danger claims.[35] First, she asserts that the individual defendants are not entitled to immunity because they repeatedly failed to perform non-discretionary, *i.e.*, ministerial duties. Second, Greenfield claims that the Complaint alleged particular facts that give rise to an inference of gross negligence that would overcome the defendants' immunity defense even for discretionary acts. Third, Greenfield contends that the Superior Court erred when it held that she had not adequately pleaded a claim under the state-created-danger doctrine. Finally, Greenfield asks us to reject the Superior Court's ruling that her claims were time-barred under 10 *Del. C.* § 8119 and not subject to tolling under 10 *Del. C.* § 8116. We will address Greenfield's first three arguments in turn. Because we agree with the Superior Court that Greenfield has failed to state a claim in her Complaint upon which relief can be granted, we need not address her statute-of-limitations argument.

---

[35] Greenfield has not challenged the dismissal of her intentional-infliction-of-emotional-distress claim or the dismissal of her non-state-created-danger civil-rights claim.

## II.    STANDARD AND SCOPE OF REVIEW

This Court reviews the granting of a motion to dismiss for failure to state a claim *de novo*.[36]  "[A] complaint sufficiently states a cause of action when a plaintiff can recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint."[37]  When considering the motion, we accept all well-pleaded allegations as true,[38] and we "draw all reasonable factual inferences in favor of the party opposing the motion."[39]  Dismissal is warranted "only if it appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle him to relief."[40]  That said, while a complaint usually "need only give general notice of the claim asserted,"[41] "circumstances constituting . . . negligence . . . shall be stated with particularity."[42]

Questions of statutory interpretation are questions of law, which we review *de novo*.[43]

---

[36] *RBC Capital Mkts., LLC v. Educ.s Loan Trust IV*, 87 A.3d 632, 639 (Del. 2014).

[37] *Browne v. Robb*, 583 A.2d 949, 950 (Del. 1990) (quoting *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978)).

[38] *Browne*, 583 A.2d at 950.

[39] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005).

[40] *Id*.

[41] *Id*.

[42] Super. Ct. Civ. R. 9(b); *see also Rattner v. Bidzos*, 2003 WL 22284323, at *13 (Del. Ch. Sept. 30, 2003) (for a gross negligence claim to survive a motion to dismiss, allegations must be particularly pled and sufficient to sustain an inference of gross negligence).

[43] *Dambro v. Meyer*, 974 A.2d 121, 129 (Del. 2009).

## III. ANALYSIS

During briefing in this Court, Greenfield narrowed the scope of her claims on Ford's behalf. In her complaint, Greenfield alleged a number of supervisory oversights by Kelly, Craighton, Miles, and Zebroski.[44] But on appeal, Greenfield has waived her claims of negligent hiring, retention, and supervision claims against Kelly, Craighton, Miles, and Zebroski in their official and individual capacities.[45] Nevertheless, Greenfield stated at oral argument that, despite the abandonment of her claims against the DFS supervisors for negligent hiring, retention, and supervision, she continued to press gross negligence claims against the DFS supervisors based on their "direct involvement" with the case.[46] We note that these allegations of "direct involvement" appear to consist of joint actions that Craighton and Zebroski supposedly took with their supervisee case workers to "identif[y] . . . concerns and risk factors" and to close the cases.[47] In contrast, there appear to be no allegations in the Complaint of "direct involvement" against Kelly and Miles—the

---

[44] *Complaint, supra* note 4, at ¶¶ 13, 14, 15, 19, 20, 21.

[45] Reply Br. 9 n.6 ("Appellant concedes any argument as to the dismissal of her negligent hiring, retention, and supervision claims against the individual Defendants in their individual capacities."). This concession was followed by Greenfield's counsel's acknowledgement at oral argument that she believed that sovereign immunity precluded such claims made against the supervisors in their official capacities and that her only remaining claims against supervisors are those of "direct involvement" as discussed below.

[46] Oral Arg. 19:40–19:57 (Mar. 6, 2019).

[47] *Complaint, supra* note 4, at ¶¶ 13, 20.

allegations against them appear to exclusively relate to supervisory acts.[48]  We

therefore focus on the two DFS cases that Smith, Bradley, Craighton, and Zebroski

("the DFS Defendants") handled in their nonsupervisory capacities.

## A. Delaware State Tort Claims Act

Greenfield challenges the Superior Court's conclusion that the DFS

Defendants were immune from suit under the Delaware Tort Claims Act.[49]

Under the DSTCA, public employees are immune from suit when

(1) The act or omission complained of arose out of and in connection
with the performance of an official duty requiring a determination of
policy, the interpretation or enforcement of statutes, rules or
regulations, the granting or withholding of publicly created or regulated
entitlement or privilege or any other official duty *involving the exercise
of discretion* on the part of the public officer, employee or member, or
anyone over whom the public officer, employee or member shall have
supervisory authority;

. . . and

(3) The act or omission complained of was done without gross or
wanton negligence.[50]

Thus, immunity under § 4001 applies to discretionary acts or omissions "done

without gross or wanton negligence."[51]

Greenfield challenges the Superior Court's application of the DSTCA in two

ways.  First, she claims that the Superior Court erred when it determined that the

---

[48] *See supra* note 44.
[49] 10 *Del. C.* § 4001 *et seq.*
[50] 10 *Del. C.* § 4001 (emphasis added).
[51] *Id.*

19

duties the DFS Defendants are alleged to have breached involved the exercise of discretion. Second, Greenfield argues that, even if that determination was correct, the Complaint pleads facts susceptible to proof that the DFS Defendants' conduct was grossly negligent,[52] and that therefore immunity is not available under the DSTCA. Greenfield is incorrect on both counts.

### i. Discretionary vs. Ministerial Acts

Greenfield argues that at least some of the DFS Defendants' acts causing Ford's injuries were ministerial by claiming that the Delaware statute that mandates

---

[52] In her briefs and at oral argument, Greenfield inserted facts and legal claims that are absent from her Complaint. For instance, in her opening brief, Greenfield asserts that the DFS Defendants had a duty to remove the children from the mother's home, Second Am. Opening Br. 6, but there is no such allegation in the Complaint. Greenfield's opening brief also cites testimony about the conditions at the Budget Motel Lodge from a deposition in Greenfield's companion case against the motel taken more than a year after the Complaint was filed. *Id*. at 27. Likewise, at oral argument, Greenfield's counsel attempted to support his legal argument by citing the contents of a February 12, 2015 root cause analysis prepared by the Department of Services for Children, Youth and Their Families even though that analysis was not incorporated into the Complaint by reference. Greenfield also integrated facts in her briefs and at oral argument that do not bear upon her underlying claims of gross negligence by the caseworkers. For example, Greenfield's opening brief asserts that Ford's mother "beat his sister to death before his eyes." *Id.* at 10. Ultimately, we must take complaints as they are written. "Matters extrinsic to a complaint may not be considered in a ruling on a motion to dismiss . . . [D]ocuments outside the pleadings may be considered only in 'particular instances and for carefully limited purposes.'" *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig*, 669 A.2d 59, 69 (Del. 1995)). Greenfield had an opportunity to amend her complaint, and it would be inappropriate for courts in an adversarial justice system such as ours to consider unincorporated documents without justification. Greenfield has not provided such justification; even so, the conclusions the Majority reaches in this opinion would not be altered by our consideration of them.

the reporting and investigation of child abuse and neglect, 16 *Del. C.* § 906,[53] assigns nondiscretionary duties to the DFS Defendants. Before addressing this contention, we would do well to explain the distinction our law draws between ministerial and discretionary acts in this context.

In *Sussex County v. Morris*,[54] after noting that courts have struggled to distinguish discretionary acts, which are subject to qualified immunity under 10 *Del. C.* § 4001, from ministerial acts, which are not subject to immunity, we adopted the definition of ministerial act set forth in the Restatement (Second) of Torts. Under that definition, acts are called "ministerial" or "operational" if the act "involves less in the way of personal decision or judgment or the matter for which judgment is required has little bearing of importance upon the validity of the act."[55] An act is discretionary if it is not ministerial.

As we have observed, the "distinction between discretionary and ministerial acts is always one of degree,"[56] but our case law helps to illustrate the distinction.

---

[53] The Complaint also refers to 29 *Del. C.* § 9003, which is the section of the Delaware Code generally setting forth the "powers, duties and functions" of the Department of Services for Children, Youth and Their Families, and 16 *Del C.* §§ 901 and 902, the general purpose and definitional sections that introduce Title 16's subchapter covering reports and investigations of child abuse and neglect. But the complaint's only particularized negligence allegations are tied to 16 *Del. C.* § 906. Likewise, Greenfield's briefs on appeal focus on the purported duties created by § 906.

[54] 610 A.2d 1354, 1359 (Del. 1992)

[55] Restatement (Second) of Torts § 895D cmt. h (1979).

[56] *Sussex Cty.*, 610 A.2d at 1359.

21

In *Sadler v. New Castle County*,[57] we held that state rescuers' decision to carry the plaintiff across a river rather than up the riverbank after the plaintiff suffered a fall was discretionary.[58] In *Sussex County*,[59] a Sussex constable was transporting a mental patient in the back seat of constable's family car when the patient jumped out of the car and was seriously injured. This Court held that the constable's "selection and equipment of the car,"[60] which was "indisputably ill-equipped for the transportation of mentally ill passengers,"[61] was effectively a ministerial act because it had "little bearing of importance upon the validity of his official conduct," *i.e.*, transporting the passenger.[62] In *Hughes ex rel. Hughes v. Christiana School District*,[63] this Court held that a teacher's decision to allow a sick student to go to the nurse unescorted was a discretionary decision, noting that "no facts support" that the teacher should have necessarily engaged in another particular course of action.[64] Rather, the *Hughes* teacher had a number of apparently reasonable options and chose among them.[65] As these cases show, a duty is discretionary if and only if the state actor faced a range of reasonable choices while performing those duties.

---

[57] 565 A.2d 917 (Del. 1989).
[58] *Id*. at 922.
[59] 610 A.2d 1354 (Del. 1992).
[60] *Id*. at 1359.
[61] *Id*.
[62] *Id*.
[63] 2008 WL 2083150, 950 A.2d 659 (Del. 2008) (Table).
[64] *Id*. at *3.
[65] *Id*. at *2–3.

Keeping this distinction in mind, we turn back to Greenfield's claim that § 906 imposes ministerial duties on the DFS Defendants. Greenfield directs our attention to three of § 906's subsections, but none of them are ultimately availing.

Greenfield first directs our attention to subsection (b) of § 906,[66] which, in relevant part, states that "[i]t is the policy of this State that the investigation and disposition of cases involving child abuse or neglect shall be conducted in a comprehensive, integrated, [and] multidisciplinary manner[.]" By its very terms, this subsection is a statement of policy written at such a high level of generality that discretion is unavoidably part of the execution of its provisions. We do not see—and Greenfield does not tell us—how this portion of § 906 could be carried out except through a considered exercise of professional judgement. Simply put, § 906(b) does not prescribe any ministerial duties relevant to Greenfield's negligence claims.

---

[66] 16 *Del. C.* § 906(b) provides that
> [i]t is the policy of this State that the investigation and disposition of cases involving child abuse or neglect shall be conducted in a comprehensive, integrated, multidisciplinary manner that does all of the following:
> (1) Provides civil and criminal protections to the child and the community.
> (2) Encourages the use of collaborative decision-making and case management to reduce the number of times a child is interviewed and examined to minimize further trauma to the child.
> (3) Provides safety and treatment for a child and his or her family by coordinating a therapeutic services system.
> (4) Requires a multidisciplinary team response for all multidisciplinary cases. The State, with assistance from the Child Protection Accountability Commission, shall implement a memorandum of understanding among agencies and entities to ensure implementation of the multidisciplinary response to such cases.

Next, in her opening brief on appeal, Greenfield argues that "[a]nother important non-discretionary duty is found in § 906(c)(1)(c),"[67] which requires "the Investigation Coordinator . . . [w]ithin 5 days of the receipt of a report concerning allegations of child abuse or neglect by a person known to be licensed or certified by a Delaware agency or professional regulatory organization, forward a report of such allegations to the appropriate Delaware agency or professional regulatory organization." But Greenfield did not mention § 906(c)(1)(c) in her Complaint. What is much more, the Complaint does not name any individual performing the role of Investigation Coordinator as that term is defined in the statute,[68] nor does it allege that a report of abuse or neglect of the type described in this subsection was ever received. Therefore, regardless of whether § 906(c)(1)(c) creates a ministerial duty, Greenfield's reliance on it is unavailing.

Finally, Greenfield relies on § 906(e), which lists numerous duties that may fairly be characterized as ministerial. For instance, § 906(e) requires that DFS must "[r]eceive and maintain reports" of abuse and neglect, conduct investigations of those reports, and conform to various reporting requirements within DFS and to

---

[67] Second Am. Opening Br. 15.
[68] According to 16 *Del. C.* § 902(20), "'Investigation Coordinator' means an attorney licensed to practice law in this State employed by the Office of the Child Advocate, who is authorized to independently track each reported case of alleged child abuse or neglect within the Department's internal information system and who is responsible for monitoring each reported case involving the death of, serious physical injury to, or allegations of sexual abuse of a child from inception to final criminal and civil disposition."

other state agencies. For her part, Greenfield focuses on subsection (e)(8), which instructs DFS to:

> At a minimum, investigate the nature, extent, and cause of the abuse or neglect; collect evidence; identify the alleged perpetrator; determine the names and condition of other children and adults in the home; . . . assess the home environment, the relationship of the subject child to the parents or other persons responsible for the child's care, and any indication of incidents of physical violence against any other household or family member; perform background checks on all adults in the home; and gather other pertinent information.

Greenfield places special emphasis on § 906(e)(8)'s requirement that DFS caseworkers assess the home environment during any child abuse investigation. And we agree that, if DFS caseworkers simply did not conduct such an assessment, they would have failed to perform a ministerial duty. But according to the Complaint, the DFS Defendants discharged all of the duties in § 906(e)(8) that might legitimately be characterized as ministerial. As the DFS Defendants point out, Greenfield's own complaint alleges that Smith and Bradley met with Tanasia, Ford, and Autumn at the family's home during their respective investigations. After those investigations, Smith thought Ford was "well-cared for,"[69] while Bradley concluded that the children's housing was a risk.[70] It is true that Smith might ultimately have performed that home assessment poorly and that Bradley might have failed to properly follow

---

[69] *Complaint*, *supra* note 4, at ¶ 13.
[70] *Id.* at ¶ 20.

up on their home assessments, but analyzing whether social workers conducted home assessments or follow-ups poorly entails analyzing the exercise of discretion of those social workers.[71]  In brief, we agree with the Superior Court's conclusion that the DFS Defendants' investigative activities and response were quintessentially discretionary.[72]

### ii. Gross Negligence

As mentioned, the DTCA will also permit a plaintiff to recover against a public-employee tortfeasor even where her actions were discretionary if the plaintiff can show that the tortfeasor acted with gross or wanton negligence.[73]  Greenfield argues that she has pleaded sufficient facts supporting a pleading-stage inference that Smith and Bradley were grossly negligent.

---

[71] *See Gutierrez v. Advanced Student Transp., Inc.*, 2015 WL 4460342, at *4 (Del. Super. July 14, 2015) ("[T]he duty to supervise students is ministerial; however, the manner and particular methods of supervision are discretionary") (internal quotations and footnotes omitted).

[72] This conclusion finds support in cases from other jurisdictions. *See, e.g.*, *James ex rel. James v. Friend*, 458 F.3d 726, 731–32 (8th Cir. 2006) (applying Missouri law to determine that a requirement for social workers to keep team members "informed of significant changes in status of the case" required the exercise of discretion in order to determine what constituted significant changes and the urgency of giving notice); *Georgia Dep't of Human Servs. v. Spruill*, 751 S.E.2d 315, 321 (Ga. 2013) (despite social services department policy requiring "an immediate to 24–hour response" to certain abuse allegations, social worker's responses to family's unavailability at their home required the exercise of discretion); *Ortega v. Sacramento Cty. Dep't of Health & Human Servs.*, Cal. Rptr. 3d 390, 399 (Cal. App. 4th 2008) (notwithstanding the rule of *Johnson v. State*, 447 P.2d 352, 361 (Cal. 1968), social worker was entitled to discretionary acts immunity because investigation required exercise of discretion). *But see Johnson*, 447 P.2d at 361 (ordinarily discretionary decisions receive no immunity "if, in a given case, the employee did not render a considered decision").

[73] *Supra* note 50.

Gross negligence is an "extreme departure from the ordinary standard of care."[74] In assessing whether a defendant's acts were grossly negligent, courts look to the reasonableness of a defendant's actions given the conditions at that time and not whether hindsight would shed more light upon whether any conditions could have served as red flags.[75] Gross negligence claims must be pleaded with particularity.[76] Judging the conduct of the DFS Defendants against this yardstick, the particular facts as pleaded do not support an inference that they acted with gross negligence.

For her part, Smith began investigating Tanasia and Ford because Ford tested positive for marijuana at birth. Her investigation disclosed the reason for the positive test—Tanasia had smoked marijuana during her pregnancy to combat her accompanying nausea. Presumably, the balance of her investigation focused on the quality of care provided to Ford and, relatedly, on whether Tanasia continued to use marijuana, possession of which was at the time still unlawful. According to the Complaint, "Smith attempted twice to schedule a meeting with [Tanasia] for a drug

---

[74] *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990). We have noted the functional equivalence of gross negligence to criminal negligence as defined in 11 *Del. C.* § 231. *Jardel Co. v. Hughes*, 523 A.2d 518, 530 (Del. 1987). Under § 231, "[a] person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

[75] *McCaffrey v. City of Wilmington*, 133 A.3d 536, 550 (Del. 2016).

[76] Super. Ct. Civ. R. 9.

evaluation; however, a drug screen was never completed."[77]  The Complaint does not tell us, even on information and belief, why the drug screen was not completed. But more to the point, after conducting a home visit, Smith concluded that Ford "was well-cared for" in the home.[78]  Perhaps Smith should have been more persistent in her efforts to schedule a drug screen, but we do not think her bare failure to do so in the absence of allegations of other troubling behavior on her part represents an extreme departure from the ordinary standard of care.

Likewise, the allegations of gross negligence on Bradley's part are lacking. Bradley, it should be recalled, met with Tanasia and the children "multiple times" during the course of the fourth and final investigation of the family and supplemented those meetings with ten telephone calls.[79]  Moreover, our reading of the Complaint leads us to conclude that Bradley succeeded in securing at least some medical treatment for the children.[80]  To be sure, the Complaint alleges that Bradley did not interview residents of the motel or "other collateral contacts"[81] and did not record any examination of the bodily marks that Tanisha's sisters had reported.  But those alleged deficiencies—admittedly indicative of *ordinary* negligence—must be viewed against the backdrop of Bradley's multiple contacts with Tanasia and the

---

[77] *Complaint, supra* note 4, at ¶ 13.

[78] *Id.*

[79] *See id.* at ¶ 19 ("Defendant Bradley reportedly spoke with [Tanasia] by phone six (6) additional times, but four (4) subsequent attempts to reach her by phone were unsuccessful.").

[80] *Id.* at ¶ 20.

[81] *Id.* at ¶ 19.

children and her referral of the case to treatment based on her concerns. Despite Greenfield's pleading to the contrary, the specific factual allegations relating to Bradley's role in this sad case, even when viewed in a light favorable to Greenfield, do not give rise to a pleading-stage inference of *gross* negligence.

As for Craighton and Zebroski, the allegations of their "direct involvement" mirror those alleged against their subordinates, Smith and Bradley. Accordingly, we likewise find that the allegations that Craighton and Zebroski were directly involved in the identification of risk factors and in the closing the cases are insufficient to support a claim of gross negligence.

Our conclusion that the acts that form the predicate of Greenfield's tort claims against Smith, Bradley, Craighton, and Zebroski were discretionary acts and that the Complaint's description of those acts does not support a pleading-stage inference of gross negligence mandates the dismissal of those claims under 10 *Del. C.* § 4001. In reaching this result, the Majority adheres to this Court's view that because "[q]ualified immunity is 'an immunity from suit rather than a mere defense to liability,'"[82] "it is important to resolve immunity issues at the earliest possible stage of the litigation. Otherwise, the benefits of such immunity [including the avoidance of burdensome discovery] are lost."[83]

---

[82] *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).

[83] *McCaffrey v. City of Wilmington*, 133 A.3d 536, 546–47 n. 43 (Del. 2016).

## B. State-created danger

Greenfield also argues on appeal that the Superior Court erred when it ruled that she had failed to make a *prima facie* state-created danger claim, a theory of recovery that this Court has not previously considered.[84] Although most of the federal Circuit Courts of Appeal have adopted some variation of the state-created danger doctrine,[85] the United States Supreme Court has never ruled on its merits, and some circuits have rejected it outright.[86] Even though Greenfield waived her other due process claims from Count II of her Complaint, Greenfield briefed and preserved her state-created danger claim from Count III of her Complaint.

Without passing on the validity of state-created danger claims in general, we reject Greenfield's claim as alleged here. The state-created danger claim as alleged

---

[84] We examine this matter as an issue of federal law because Greenfield brought her state-created danger claim under 42 U.S.C. § 1983, *Complaint, supra* note 4, at ¶¶ 29–30 (Count III), and § 1983 is a federal statute that only provides redress for violation of federal law, *see Maine v. Thiboutot,* 448 U.S. 1, 5 (1980); *Slawik v. State*, 480 A.2d 636, 640 (Del. 1984). In contrast, Count II of Greenfield's Complaint alleged civil rights violations under the United States *and* Delaware Constitutions, but the Superior Court found that Greenfield waived that claim, and she did not appeal that ruling.

[85] *See Pena v. DePrisco*, 432 F.3d 98, 107–10 (2d Cir. 2005); *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006); *Robinson v. Lioi*, 536 F. App'x 340, 343 (4th Cir. 2013); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993); *Forrester v. Bass*, 397 F.3d 1047, 1057–59 (8th Cir. 2005); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006); *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995); *Butera v. District of Columbia*, 235 F.3d 637, 648–51 (D.C. Cir. 2001); *see also Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015).

[86] *See J.R. v. Gloria*, 593 F.3d 73, 79 n.3 (1st Cir. 2010); *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 1001 (5th Cir. 2014); *Vaughn v. City of Athens*, 176 F. App'x 974, 976 n.1 (11th Cir. 2006).

in Greenfield's complaint is a subset of federal due process claims.[87]  But there can be no state-created danger claim where the United States Supreme Court has stated that there is no due process violation.  And because the United States Supreme Court has explicitly stated that no due process claim lies under facts that are nearly identical to the alleged facts in this case, Greenfield can have no state-created danger claim, at least under federal law,[88] whatever the contours of those claims may be.

In *DeShaney v. Winnebago County Department of Social Services*,[89] the United States Supreme Court rejected a plaintiff's due process claim where social workers did not permanently remove a child from his abusive father's custody even though social workers were repeatedly notified of injuries indicative of abuse and the father eventually beat the child so severely he fell into a coma.[90]  The United States Supreme Court held that "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."[91]  The Court held that there was no violation even though social workers had "actually undertaken to protect [the child] from [the] danger" posed by the child's father.[92]

---

[87] *Bright v. Westmoreland Cty.*, 443 F.3d 276, 282 (3d Cir. 2006).
[88] We need not decide and do not decide whether a state-created danger claim may be available under the Delaware Constitution as such a claim was not raised.
[89] 489 U.S. 189 (1989).
[90] *Id*. at 191–193.
[91] *Id*. at 197.
[92] *Id*.

We see no relevant distinction between *DeShaney* and this case. This case involves an abusive parent and social workers who allegedly knew or should have known that the parent was abusive, just like in *DeShaney*. Greenfield has alleged that an abusive parent injured Ford after the social workers' inaction, just like in *DeShaney*. And the Complaint does not allege any affirmative action by DFS to prevent others from acting on behalf of the child, just like in *DeShaney*. Even though *DeShaney* did not address state-created danger claims in particular, it clearly foreclosed state-created danger claims in those circumstances given that state-created danger claims are a subset of due process claims, which *DeShaney* explicitly held did not exist under that case's circumstances.

Greenfield argues that DFS's assertions that they would protect Ford induced her to "refrain from taking further steps to protect [Ford] herself,"[93] thus creating liability when Ford was injured after DFS did not in fact protect Ford. But that is exactly the sort of argument that *DeShaney* rejected: "The affirmative duty to protect arises not from . . . [the state's] expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."[94] Simply because Greenfield relied on DFS to protect Ford does not mean DFS limited

[93] Second Am. Opening Br. 33.
[94] *DeShaney*, 489 U.S. at 201.

32

Greenfield's freedom to act on her own. And because there is no contention here that DFS limited Greenfield's freedom to act,[95] we cannot accept her claim.

## IV. CONCLUSION

The Majority recognizes that, to many, the dismissal of Greenfield's complaint on Ford's behalf will be an unfitting conclusion to this tragic case. After all, who among us does not wish to help Ethan Ford? But under our law, which places a value on relieving public employees from private liability for acts involving the exercise of discretion that are performed in good faith and without gross negligence, we require that legal complaints based on those acts state particularized allegations leading to an inference of gross negligence. Unfortunately, such allegations are absent from the Complaint here, and accordingly, we AFFIRM the decision of the Superior Court.

---

[95] We reject Greenfield's attempt at oral argument to recharacterize the Complaint to suggest that she had alleged such action. *See* Oral Arg. 21:07–19:57 (Mar. 6, 2019) ("[DFS said], 'hey, we got this; we're looking into this; we're gonna take care of this; *you back off, aunt*.'" (emphasis added)).

**STRINE**, Chief Justice, concurring in part, dissenting in part:

This is a sad and difficult case. I respect the decision of the trial court, and my colleagues in the majority, that Greenfield, as next friend and guardian *ad litem* of Ethan Ford, did not meet the understandably stringent pleading standard that applies when a plaintiff seeks to hold public servants doing the difficult job of child protection liable for making misjudgments. Facing burdensome caseloads, complex human dynamics, and the requirement to balance the sometimes competing interests of assuring the protection of children but not erroneously depriving them of the care and love of a parent, the professionals who go to work every day doing these jobs rightly deserve not to fear that some slip up in situational judgment will expose them to liability. Not only that, I also agree with the majority that the trial judge was required to address the complaint as it was pled, and not consider information that was not properly incorporated into the complaint.[96]

Acknowledging that, I respectfully dissent in part from the majority's excellent decision. Given the high bar that must be pled to state a claim against the DFS Defendants,[97] it is difficult, I suppose, to conclude that the caseworker who conducted the initial Department of Family Services ("DFS") investigation of

---

[96] I also concur in the majority's determination that the defendants' obligations under 16 *Del. C.* § 906 were discretionary, not mandatory or ministerial, and that Greenfield has failed to state a state-created danger claim.

[97] I collectively refer to all of the individual defendants as the DFS Defendants.

34

Ethan's mother (the "Mother") and closed her case as "unsubstantiated with concern," can be determined to have breached her duty to investigate in a grossly negligent manner, even as a pleading stage matter.[98] Gross negligence is a high standard,[99] and although it is troubling that a case would be closed without compliance with the conditions DFS requested,[100] the Mother's initial warning signals did not involve any act by her of physical abuse of Ethan, but was based on Ethan being born with marijuana in his system.[101]

Where I depart from the majority is as to the DFS Defendants who were involved in the Mother's case after that. After the Mother was referred to DFS a second time because both Ethan and his half-sister were found at 1:00 a.m. wandering around outside in their diapers,[102] the caseworker was in my view duty bound to take account of the first investigation and the Mother's failure to take actions assuring DFS that the concerns that justified the first investigation were addressed. Instead, the case worker noted that the children were developmentally delayed and recommended that the Mother have the children evaluated.[103] But the Mother failed to do so, and DFS never followed up.[104] Fifty-five days after the

---

[98] App. to Opening Br. at A80–81 (First Amended Complaint (March 24, 2017)).
[99] *See Browne v. Robb*, 583 A.2d 949, 954 (Del. 1990).
[100] *See, e.g.*, App. to Opening Br. at A80–81 (First Amended Complaint (March 24, 2017)).
[101] *Id.*
[102] *Id.* at A81.
[103] *Id.* at A81–82.
[104] *Id.*

investigation was opened, DFS closed the second case as "unsubstantiated with concern."[105]

This pattern repeated itself during the next two investigations. Reports would come into DFS—that "the children were locked in a room for long periods of time and could not communicate appropriately"[106] or that the children had marks on their bodies[107]—the DFS investigators would speak to only the Mother and her children and not interview any collateral sources, recommend some remedial actions, fail to follow up when the Mother did not complete this follow up, and close the case as "unsubstantiated with concern" less than two months after each investigation was opened.[108] In the final investigation, which closed less than ten weeks before the Mother beat her daughter to death in front of Ethan, the DFS investigators failed to even investigate reports of marks on the children's bodies.[109]

DFS employees have an affirmative duty to investigate potential "cases involving child abuse or neglect."[110] And those investigations "*shall* be conducted in a comprehensive, integrated, multidisciplinary manner."[111] A DFS employee performs those duties in a grossly negligent manner when conducted with a

---

[105] *Id.* at A82.
[106] *Id*.
[107] *Id.* at A83–84.
[108] *Id.*
[109] *Id.*
[110] 16 *Del. C.* § 906(b).
[111] *Id*. (emphasis added).

"conscious indifference" or "I-don't-care" attitude,[112] which can include failing to investigate allegations of neglect or abuse or disregarding red flags, patterns of abuse, and evidence of danger to the child.[113] And that is, effectively, what the complaint alleges occurred here.

When the subject of a child protection investigation is directed to take remedial actions that provide assurance that she is not a danger to her children and then fails to comply, that is the opposite of reassuring. To close the case then is concerning, which makes even the termination of the first case a close call for dismissal. You close a case because your concerns have been sufficiently addressed and alleviated. You don't close a case when the conditions you've imposed to ensure the child's safety have been flouted. When the subject engages in subsequent conduct triggering successive investigations and DFS repeatedly closed those investigations when the subject had not complied with the conditions the DFS Defendants themselves imposed, that behavior involves, at the pleading stage, a disregard of known risks so substantial as to support an inference of gross negligence.

---

[112] *McCaffrey v. City of Wilmington*, 133 A.3d 536, 547 (Del. 2016).

[113] *See Bass v. S.C. Dep't of Social Servs.*, 780 S.E.2d 252, 260 (S.C. 2015) (finding that the "failure to conduct a post-EPC investigation into the stated reason for the children's removal from the home" and the failure "to interview the children's doctors, other medical staff at the hospital, or their family doctor who initially treated the children, and the fail[ure] to investigate the medication after being told that the children fell ill shortfall after [the Mother] administered the [medicine] to them" constituted gross negligence).

Most of all, Greenfield has stated a claim as to the Director of DFS during the final three investigations. Although Greenfield has confusingly addressed the claims against the Director of DFS and other DFS Supervisors,[114] Greenfield has consistently argued that the Director of DFS and the other DFS Supervisors committed gross negligence by "repeated[ly] fail[ing] to use the tools available to them to take meaningful action."[115] To my mind, Greenfield is correct because one of the jobs of a DFS director is to put in place systems to address situations like this, where an individual is repeatedly investigated by DFS and where that individual, rather than complying with DFS's conditions and acting in a way that assures DFS that the parent can safely remain in custody of her child, instead fails to comply with the reasonable requirements set forth by the manager's line caseworkers. Here, nothing in the record of the Mother's repeated contacts with DFS provides

---

[114] In her reply brief in this Court, Greenfield "concedes any argument as to the dismissal of her negligent hiring, retention, and supervision claims against the individual Defendants in their individual capacities." Reply Br. at 9 n.6. But I read that concession, in the context of the DFS Defendant's answering brief and the Superior Court's decision below, as a modest concession that a negligent supervision claim can be maintained against only an employer—here DFS—and not individual employees. Oral Argument at 44:00–44:45 ("We have not conceded that her [the DFS director's] direct involvement in this case in anyway is not being pressed. We solely concede that we are unable to maintain a claim as to negligent hiring, retention, and supervision in solely in the supervisory capacity because that implicates the State as employer. And so we are simply whittling away the claims to those that can make it through the screen of immunity."). Here, I thus concentrate on what Greenfield has not dropped, which is her argument that the DFS director and other supervisors were grossly negligent in addressing the Mother's case because they undertook no actions to assure that repeat cases involving investigated subjects who did not comply with DFS's recommended remedial actions were not repeatedly closed without any assurance that the known risks justifying the investigation's initiation were addressed.

[115] App. to Opening Br. at A87 (First Amended Complaint (March 24, 2017)).

reassurance that she was on the right path. Instead, there is a pattern of noncompliance with DFS's reasonable requests for the Mother to get a drug screening or get the children evaluated,[116] and a pattern of DFS line workers reacting to that, not by taking remedial action to address the Mother's non-compliance, but by closing the case.[117]

For these reasons, I would reverse as to the claims against the DFS Defendants involved in the last three investigations. I do so without enthusiasm, precisely because I acknowledge how difficult the work that these defendants were required to do is. In dissenting, I also underscore the reality that, as in any case, the fact that a complaint states a claim is a far cry from a determination that the defendants in fact fell short of the mark after all the evidence is heard. For present purposes, however, I think that Greenfield should have the chance to seek discovery in aid of proving out her claims against these defendants.

---

[116] *See id.* at A80–85.
[117] *Id.*